## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

FEDS FOR MEDICAL FREEDOM;                )
JOSE VILLELA; TASHA ANDREWS;             )
ADAM ARCE; ALEXANDER BAYON;              )
MALCOLM BEZET; ALDABERT BIELSKI;         )
LAURA BRUNSTETTER; ALEX BUSTILLOS;       )
GRAHAM CODER; KIMBERLY CORPORA;          )
JOSHUA CRIBBS; MICHAEL DEBEY;            )
JAMES DROHAN; SAMUEL EBEYER;             )
MARIAN ELLIOTT; JENNIFER GEREN;          )
RACHELLE GLENN; BRETT GLOSS;             )
IVAN GUTIERREZ;  WARREN JENKINS          )
BRADLEY JOHNSON; MONTE KEIPER;           )
SCOTT LEMASTER;SCOTT MCGLOTHIN;          )
TY MORRISON; GARRET O'BOYLE;             )
ANN PARRILLO; SUNDANAH PARSONS;          )
DANIEL SAAVEDRA; ROBERT SCOTT;           )
ANDREW SELLERS; KYLE SERAPHIN;           )
LANCE SHAKESPEAR;                        )
CHRISTOPHER TOOMPAS; BRIAN TOY;          )
ANOTHONY TRAN; MARY BETH WRIGHT;         )
PATRICK WRIGHT; PATRICK YORK             )
                                         )
                                         )
            **Plaintiffs**               )          Civil Action No. 4:23-cv-01817
                                         )
            v.                           )
                                         )
MERRICK B. GARLAND,                      )          AMENDED COMPLAINT—
ATTORNEY GENERAL                         )          CLASS ACTION
U.S. Department of Justice               )
950 Pennsylvania Avenue, NW              )
Washington, D.C. 20530-1000              )
(in both his individual and official capacity),  )
                                         )
U.S. DEPARTMENT OF JUSTICE,              )
AGENCY                                   )
U.S. Department of Justice, Room 4400    )
950 Pennsylvania Avenue, NW              )
Washington, D.C. 20530-000,              )
                                         )
CHRISTOPHER WRAY, DIRECTOR,              )
FEDERAL BUREAU OF INVESTIGATION          )

(in both his individual and official capacity),  )
935 Pennsylvania Avenue, NW     )
Washington, D.C. 20535-0001     )
                  )
FEDERAL BUREAU OF INVESTIGATION, )
AGENCY,            )
935 Pennsylvania Avenue, NW     )
Washington, D.C. 20535-0001,     )
                  )
      **Defendants**     )

## AMENDED COMPLAINT—CLASS COMPLAINT

1)  Plaintiffs Feds for Medical Freedom, *et al.*, ("Plaintiffs"), by and through their

attorneys, pursuant to Fed. R. Civ. P. 15(a)(1)(B ), state the following in support of their

Amended Complaint and Jury Demand against Merrick Garland, *et al.*, ("Defendants").

## INTRODUCTION

2)  The COVID-19 pandemic has been declared officially over. But the harm has

been done. For over three years, it ravaged lives, forced lockdowns, cheated people of free

movement, and divided a country and the world. It also robbed thousands, if not millions, of

workers of their liberty, dignity, and religious freedom.

3)  While the pandemic clearly presented novel issues of medicine, medical freedom,

bodily autonomy, religious freedom, and law and policy, there was never a time of fulsome

consensus by the government, medical personnel, or the citizenry on how to respond to it.

4)  Indeed, as more information about the pandemic now comes to light, much of

what was considered false or controversial at one time enjoys acceptance as factually accurate

and true.[1]

---

[1] Or Fleisher, et al. *Masks Work. Really. We'll Show You How.*, NYTIMES.COM, (October 30, 2020) at
https://www.nytimes.com/interactive/2020/10/30/science/wear-mask-covid-particles-ul.html; *compare to*, Apoorva
Mandavilli, *The C.D.C. concedes that cloth masks do not protect against the virus as effectively as other masks. The
update in guidance comes as coronavirus cases continue to soar*, NYTIMES.COM, (January 14, 2022) at
https://www.nytimes.com/2022/01/14/health/cloth-masks-covid-cdc.html, Bret Stephens, *The Mask Mandates Did*

5)      Yet, despite this confusion, uncertainty, and evolving information, one thing remained constant throughout: the Government's obligations under Title VII of the Civil Rights Act, the Religious Freedom Restoration Act, and others.

6)      It is becoming clear that some, including the Defendants here, made unfounded and plainly unlawful decisions, trampled individuals' rights, and ostracized people based on their sincerely held religious beliefs.

7)       As in the instant matter, it is clear that government agencies continued to require the COVID-19 vaccination in spite of Plaintiffs' religious objections, even after they were aware that vaccine did not stop the spread.

8)      Nothing that occurred during the pandemic warranted the government in blindly abandoning its required due diligence, ignoring voices of the few for the sake of the many, and rebuking issues of morality and religious belief by drawing a line in the sand that trampled the rights of its citizens and employees. And nothing warranted it virtually holding religious believers hostage, under threat of termination, while it ignored their deeply held religious beliefs and took absolutely no action on their legal and protected requests for religious accommodation from the vaccine.

9)      Plaintiffs are employees of the Federal Bureau of Investigations ("FBI" or the "Bureau") and are located in various states around the country.

10)      They each experienced discrimination and harassment based on their religious beliefs as a result of the FBI's and U.S. Department of Justice's ("DOJ") implementation of Executive Order 14043 (Sept. 9, 2021), ("E.O. 14043") requiring COVID-19 vaccination for all Federal employees.

---

*Nothing. Will Any Lessons Be Learned?*, NYTIMES.COM, (Feb. 21, 2023) at
https://www.nytimes.com/2023/02/21/opinion/do-mask-mandates-work.html.

11)     Defendants discriminated against Plaintiffs in terms, conditions, and privileges of employment. They persecuted and harassed Plaintiffs for their beliefs, their request for religious accommodations went unanswered, and some were constructively discharged or outright terminated.

12)     Defendants coerced Plaintiffs into violating their beliefs, threatening them with termination, placing them on unpaid leave, shaming, "outing," segregating, and excluding them in a way that adversely affected the terms and conditions of their employment.

13)     Defendants violated Title VII, RFRA, and the 1st and 5th Amendments to the U.S. Constitution when they denied (or failed to respond to) Plaintiffs' requests for religious accommodations to its COVID-19 vaccine mandate and implemented other onerous obligations that violated Plaintiffs' religious beliefs.

14)     Despite years of dedicated service by Plaintiffs, many of whom put their lives on the line in their current jobs or in their prior service in the Armed Forces, Defendants took adverse actions against Plaintiffs, including discrimination and harassment, not because they failed in executing their duties, and not because Defendants found that they presented an actual medical risk to others. Defendants took such actions because Plaintiffs held sincere religious beliefs that were legitimately antithetical to taking the vaccine, and those religious beliefs did not fit in a culture that embraced the vaccine, and more importantly the Defendants valued forcing others to "embrace" the vaccine over many other cherished values like religious liberty, mutual respect, bodily autonomy, and human dignity. All of this occurred despite early knowledge that the vaccine did not actually prevent employees from acquiring or transmitting the disease.

15)     By forcing Plaintiffs to choose between a relatively new and not-fully-approved vaccine and their strong and sincerely held religious convictions, Defendants exerted coercive

pressure and operated within a discriminatory framework that violated applicable laws and the U.S. Constitution.

16)     In an attempt to "render being unvaccinated so burdensome that those who haven't received shots will have little choice other than to get them,"[2] the Defendants set up a separate, and more burdensome, process for religious accommodation for those with religious objections to the COVID-19 vaccine.

17)     FBI employees with religious objections to the vaccines have endured various forms of physical invasion, lack of acknowledgement and accommodation, professional and interpersonal humiliation, privacy breaches, ostracism, harassment, constructive discharge, and countless other instances of discriminatory behavior as a direct result of their sincerely held religious beliefs.

18)     These individuals, whose mission it is to protect the ideals of liberty and freedom, bring this suit to remedy the harms they suffered at the hands of the Defendants, and to bring accountability to those who have made a mockery of that mission.

## JURISDICTION AND VENUE

19)     Plaintiffs' claims arise out of Defendants' violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(f)(3), the Religious Freedom Restoration Act 42 U.S.C § 2000bb-1 *et seq*., and the United States Constitution.

20)     This Court has jurisdiction under 42 U.S.C. § 2000e-5(f)(3) (the Civil Rights Act), 5 U.S.C. §§ 701–706 (Administrative Procedures Act), and 28 U.S.C. §§ 1331 (federal

---

[2] Maegan Vasquez, *Biden announces measures to incentivize COVID-19 vaccinations, including a requirement for federal employees*, CNN.com, (July 29, 2021), available at: https://www.cnn.com/2021/07/29/politics/joe-biden-vaccination-requirement-announcement/index.html (last visited, May 6, 2022).

question jurisdiction), 1346 (U.S. as defendant), 1361(action to compel U.S. official to perform his duty), and 2201(U.S. as defendant).

21)     The Court also has jurisdiction pursuant to Title 28 U.S.C §1332 (diversity of citizenship) and 28 U.S.C. §1343(a)(4) (jurisdiction over Civil Rights claims).

22)     Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the unlawful practices alleged occurred in this district, and 28 U.S.C. § 1391(1)(B) because the United States, one or more of its agencies, and one or more of its officers in his or her official capacity are Defendants; and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, at the FBI's Houston Field Office.

## **PARTIES**

23)     Plaintiff Meds for Medical Freedom is a nonprofit membership organization with its incorporation paperwork on file in Nevada. Feds for Medical Freedom has over 9000 members who are employees or contractors for nearly every federal agency and located in every U.S. state and many foreign countries. The purpose of Feds for Medical Freedom is to protect employee rights by confronting the federal government's mandates requiring vaccination for COVID-19.

24)     Plaintiff Tasha Andrews has been an employee of the FBI since November 1, 2015. During this time, she has been a faithful, hardworking, and productive employee, earning several awards, including Professional Staff Employee of the Month and Employee of the Year. On October 5, 2021, Ms. Andrews submitted a religious exemption request to avoid being compelled to take the COVID-19 vaccine based on her sincerely held religious beliefs. She is a firm believer in privacy and felt violated that she was forced to disclose her personal but deeply

held religious beliefs (and soon after her private medical information). Aside from an automatic

email reply to her accommodation request, she received no personal response at any point. She

tried diligently to understand the accommodations process but found the information on the

FBI's website constantly changed. Several attempts to engage the personnel in charge of the

accommodation response went unanswered. Like many others, she was threatened with AWOL

status if she failed to upload frequent and physically burdensome negative COVID-19 tests

results. She was also subject to rules requiring her to "wear a face covering at all times indoors

except for when alone in a private office or when actively eating or drinking at least eight feet

away from others." This guidance went beyond what was recommended by the CDC (which

recommended only six feet of social distancing) and targeted her in front her coworkers as

someone who was non-compliant, inconsiderate, and who did not care about others, when in

reality, she was simply trying to remain faithful to her sincere religious beliefs. The requirements

made her feel unwelcome, separated, shamed, and pressured.

     25)    Plaintiff Adam Arce is an Electronic Technician with the FBI in its El Paso

location. Mr. Arce's religious beliefs prevented him from taking the vaccine. Like others, he was

threatened with termination if he did not get vaccinated. Even though most of the employees

around him were vaccinated and yet were still acquiring and spreading COVID-19, only

employees such as Mr. Arce (who objected to the mandatory vaccine on religious grounds), were

forced to mask, test every 72 hours, social distance, and attest to their vaccination status. The

employees getting sick were vaccinated, yet no precautions were in place to reduce their own

spread of the disease. His leaders and coworkers treated him as "unpure." Management denied

him the ability to attend work-related trips and co-workers would not even ride in the same

vehicle with him. Mr. Arce requested reasonable accommodation and other than an

acknowledgement, Defendants never acted upon or responded to it.

26)     Plaintiff Alexander Bayon was an Operational Support Technician in the Miami Field Office for five years. He holds strong religious beliefs that his body is a temple and that a higher power has provided all the sustenance he needs through the natural world. He adheres to this belief strictly in his daily life, including in the food he eats, the products he uses on his body, the medicines he takes, and the air he breathes. He takes a holistic approach to medicine and treatments and opposes modern practices such as vaccines as part of his religious beliefs. As such, when the vaccine mandate was put in place, he filed a request for a religious accommodation, explaining that because a higher power provides all the protection he needs, it would be offensive to take the vaccine, or subject himself to testing and masking. Defendants denied his request to be exempt from testing and masking requirements and therefore, because of his religious beliefs, he was put on AWOL status on December 1, 2022. Because he was on AWOL status and not able to be at work, the FBI ultimately terminated him on June 17, 2022, that his absence (which it required because of his religious beliefs) was an undue burden on the Bureau.

27)     Plaintiff Malcom Bezet was a 20-year veteran of the FBI with a strong performance record. He was vehemently opposed to the vaccine mandate on religious grounds, but also objected to the process Defendants used to collect and retain personal information related to accommodations requests and medical inquiries related to the vaccine, which he felt violated the law. He filed two whistleblower complaints along these lines. Accordingly, instead of initially filing a religious exemption from the vaccine mandate (which he later did), he filed a request for a legal exemption to the mandate and to the collection of his personal information with the FBI's General Counsel. Hearing nothing in return, he followed up several times seeking

a status update. Instead of getting one, he was "referred for insubordination for failing to comply with deadlines for the vaccination," and was subjected to the disciplinary process of the FBI. He ultimately relented and filed a request for religious accommodation on December 30, 2021, but he never received a response. This experience became untenable, and Mr. Bezet retired from the FBI one year later.

28)    Plaintiff Aldabert Bielski is a 13-year FBI veteran who is an intelligence analyst assigned to the FBI's Chicago Field Division. Mr. Bielski has received multiple high-level awards for his work and two commendations. In the fall of 2021, his superiors notified Mr. Bielski that he needed to get vaccinated or face dismissal from the FBI. He notified his supervisor on October 7, 2021, that he was requesting a religious accommodation to be exempt from the vaccine because the vaccine was "diametrically opposed to [his] sincerely held personal religious beliefs as a practicing Roman Catholic[.]" Because of his beliefs he was required to take COVID-19 tests frequently (within 72 hours of entering an FBI facility), which was not required of employees who did not submit requests for religious accommodations. The system of record for testing was flawed, and although Mr. Bielski was always up-to-date on his testing, he was frequently chastised for not submitting his test results on time. He expressed that the constant pressure about the vaccine and testing created tremendous stress, for which his leadership required him to attend counseling sessions through his Employee Assistance Program ("EAP"). In the involuntary "referral" to the EAP, his leader stated that he was being referred to address personal stress related to his job and the covid crisis, and for "performance problems." The referral was made in December 2021, just one month after his annual performance review in which he was rated "consistent performer." The FBI and DOJ suspended all requests for accommodation in January 2022, leaving Mr. Bielski and others in the dark as to next steps and

how to proceed. In the meantime, he was required to continue testing every seven days during high transmission periods, in some cases paying out-of-pocket because of a change in the funding policy in the summer of 2022.

29)     Plaintiff Laura Brunstetter has served in the FBI for 19 years and is currently a Special Agent in the Texas City Resident Agency. She is a trained Crisis Negotiator, as well as a Special Agent Assessor. Ms. Brunstetter has an exemplary performance record. Her religious beliefs prevent her from taking the COVID-19 vaccine for which she filed a religious accommodation request. The accommodations form changed from the standard accommodations form in place at the time, however, including the addition of several onerous questions that religious believers were required to complete. Ms. Brunstetter provided this information only to learn that the process changed again shortly after she filed her request, indicating that the additional questions were only optional. Nevertheless, her information—her sincere but private religious beliefs, which she holds deeply— were now publicly and permanently stored within a government organization database. As early as summer 2021, the medical community, the FBI, and the CDC knew that the vaccinated were at risk of contracting and transmitting COVID-19, yet the FBI never changed its policies to include testing and other protocols for vaccinated employees. They did not have the same limitations on travel and quarantine as did employees with religious objections to the vaccine. Ms. Brunstetter suffered coercion and intimidation and was treated differently than others who did not share her beliefs.

30)     Plaintiff Alex Bustillos is an FBI agent in the counterterrorism unit. He has a good performance record with the FBI. His believes as a religious matter that, because human life begins in the womb, abortion is murder. As a Christian, his faith prevented him from taking any vaccines that were tested or developed using cell lines of aborted babies, which includes all

COVID-19 vaccines available at the time.[3] Accordingly, he filed a request for an accommodation to be exempt from the vaccine. As a result, he was subjected to "safety protocols" that required him to mask, social distance, and test. Employees without such religious objections were not required to follow these protocols. He was required to wait in long lines or purchase expensive tests every three days to comply with the testing mandates. Wearing a mask was like "wearing a Scarlet A," since only those with religious or medical objections to the vaccine were required to wear masks. Many employees who did not share Mr. Bustillos' beliefs did not even want to stand near him or others with similar beliefs. The policies created dissention among employees and created a stigma for employees whose religious objections prevented them from getting the vaccine.

31)     Plaintiff Graham Coder has been with the FBI for 15 years. He has a strong performance record and is based out of the Las Vegas Field Office. Mr. Coder filed a request to be exempt from the vaccination mandate based on his sincerely held Christian principles. He did so under duress, never believing that he would have to disclose his most personal religious beliefs to a government agency to justify his decision not to take a vaccine that he did not want. Like every other Plaintiff, he never received a decision on his accommodation request.

32)     Plaintiff Kimberly Corpora is an 18-year career FBI employee who currently works as a Tactical Specialist. She has always been a "consistent" performer and has never been counseled until she was placed into AWOL status because of her religious objections to the

---

[3] *See, e.g.*, Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, NEWSWEEK, (March 21, 2021), at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

vaccine and the testing mandates. She filed a religious accommodation on September 22, 2021, to be exempt from the vaccine mandate based on her sincerely held religious beliefs. Accordingly, she was required to participate in "safety protocols" (testing, masking and social distancing), which were not required of employees who did not share her religious beliefs about such activities. When her supervisor asked her whether she planned to comply with the new testing requirement to be in the office, she politely declined because of her religious beliefs against such activities. He directed her to leave the building. She was forced to take leave beginning in November of 2021, which required her to exhaust her annual leave and sick leave, before being required to go into unpaid leave status (LWOP). She requested an accommodation to be moved to another FBI office that did not require testing because of low or medium infection rates at the time; however, her request was declined for no other reasons than because she "was assigned to the West RA Office and was not allowed to work from another FBI office." Historically many employees worked from the West RA office as a matter of convenience, even though they were assigned to different offices. In May 2022, Ms. Corpora was placed on AWOL status for not following testing protocols, after being denied any additional LWOP status.

33)     Plaintiff Joshua Cribbs is a 13-year veteran of the FBI. He currently serves as a Special Agent in the Philadelphia Division. He has received good or outstanding performance reviews throughout his tenure and has never received any disciplinary action. Mr. Cribbs filed both a religious and a medical exemption from the vaccine mandate. Because of the use of aborted fetal cells in the development of the vaccines, his religious convictions prevented him from getting the vaccine, as did his heart conditions, for which he wears a pacemaker. Like many other employees with religious objections to the vaccine, he was subject to "safety protocols" (testing, masking and social distancing), which employees without such religious beliefs were

not subject to. The policy was in place until August 2022, long after it was widely recognized that the vaccine did not stop the spread of COVID-19.

34)     Plaintiff Michael DeBey has worked for the FBI since 2011 and has a solid performance record. He works in the Operational Technology Division in Quantico, Virginia, and requested a religious accommodation to the mandate because of his firmly held religious beliefs against the vaccine. He did so under duress because he did not believe the mandate was lawful, but also feared for his job and knew he would be dismissed if he failed to file. He believes that the DOJ was forcing people to get a new vaccine for a disease that was "poorly understood." To do so for him would be a violation of his sincere religious beliefs. He was being forced into adopting a "secular ideology," which was antithetical to his faith and beliefs. The work situation became untenable and DOJ 's policies "created a culture of animus towards people with religious beliefs," including actions that were hostile towards Christians and people of other religious faiths. The FBI placed him on indefinite suspension in March of 2022.

35)     Plaintiff James Drohan is an 18-year veteran of the FBI and has a good performance record with the service. He works out of the Newark Division of the Bureau. He believes that if he took the vaccine, he would be violating his fundamental religious beliefs; therefore, he filed a request for a religious accommodation. He was forced to take frequent and onerous COVID-19 tests, yet employees who did not share his religious beliefs were exempt from that requirement, notwithstanding that they contracted and spread the disease. Some even came into work with COVID-19 symptoms but were not required to test.

36)     Plaintiff Samuel Ebeyer filed a religious accommodation request after he received the mandate that he had to be vaccinated. He believes that scripture teaches that life begins at conception and that he "cannot benefit, no matter how derivative, of data rendered as a result of

abortion." Like other Plaintiffs, he understood that his future employment with the FBI hinged

on whether he was granted a reasonable accommodation. He was not. He never received a

determination on his request. He received the notice on January 22, 2022, from FBI HR that the

vaccine mandate was suspended pursuant to a temporary injunction issued by a federal court.

The email was clear that the injunction "has no effect on enforcement of other workplace safety

protocols. Existing protocols such as masks, physical distancing, testing, and quarantines remain

in place." It emphasized in bold that "**Employees that have not attested to being vaccinated**

**must continue to provide proof of negative COVID-19 tests every 72 hours or will continue**

**to be charged AWOL when appropriate."** Mr. Ebeyer complied with all the coercive

directives, but employees who did not share his religious beliefs were not required to comply;

notwithstanding that they were getting sick with COVID and transmitting it to others.

37)     Marian P. Elliott has worked for the FBI for 11 years. She has a good

performance record with no negative evaluations, and has received multiple incentive and time-

off awards. Her religious beliefs dictated that she decline the COVID-19 vaccine, and she

applied for a religious exemption to save her job. She was thereafter required to attest to her

vaccination status in writing, which was recorded in a system of record, as well as upload

negative test results every 72 hours (at first) and then every seven days. Employees who did not

share her religious objections to the vaccine were not required to test, nor were FBI contractors

or other non-employee personnel sharing her workspace. Ms. Elliott's personal and private

religious beliefs are in her permanent personnel record, as is her medical status related to the

vaccine and COVID-19. The process has caused her severe emotional stress and anxiety and she

hopes that this process results in her records being purged of her personal religious beliefs, her

vaccination status, and test results. They are, in her view, invasions of privacy used to coerce

Plaintiffs into taking the vaccine.

38)     Plaintiff Jennifer Geren is a former FBI Evidence Technician. When the vaccine

mandate began, she filed a request for a religious accommodation. She believes that "we are

created in the image of God and [sic] our bodies are sacred and we must not interfere with our

bod[y]'s natural responses […she] could not in good conscious [sic] receive the vaccine." Ms.

Geren objected to the testing requirements that were thrust upon those with religious objections

to the vaccine (but not on those without such objections) and was placed on AWOL status on

December 13, 2021. She ultimately resigned in August of 2022 because of untenable working

conditions and imposition on her faith.

39)     Plaintiff Rachelle Glenn has worked for the FBI for seven years and is currently

based out of its Charlotte Division. She is an Army Veteran who served two deployments to Iraq.

She has always received performance evaluations of "Successful" and/or "Consistent" or higher,

and has received multiple incentive, time-off, and On The Spot Awards, as well as a Citation for

Special Achievement. Ms. Glenn is an Agnostic, which means she believes there is a God and

creator, but she does not believe one religion has supremacy over others or other religions. She

believes that "life is sacred and that to kill an unborn child to sell his or her body parts for

commercial or scientific use is not just morally wrong, but wicked and lacking in utter

humanity." She also believes "the use of experimental vaccines with no long-term safety

information. . . is a flagrant disregard for the sanctity of life." Accordingly, she filed a request for

a religious exemption on October 12, 2021, for which she received an acknowledgement of

acceptance, but never received a letter of determination. After the "safety protocols" were

announced in November 2021, she filed a second request for religious exemption from masking

and testing which the FBI denied on March 23, 2022. Because of this, she was notified on

15

December 13, 2021, that she would be placed into AWOL status unless she submitted a negative COVID-19 test. She was no longer allowed to use her accrued leave and was coerced into taking the COVID-19 test against her will and her religious beliefs to save her job. Throughout this time, Ms. Glenn's leadership discussed her medical information; her co-workers were informed that she was the only agent in the office who was unvaccinated, and her management compared her (as the only unvaccinated employee in the room) to a "tide-pod eater[]." She was the only person in her office forced to wear a mask and social distance and thus was singled out for harassment and discrimination. No other employees who did not share Ms. Glenn's religious beliefs were required to undergo the humiliating "protocols" she was forced to endure, notwithstanding that many of them contracted and transmitted COVID-19.

40)     Plaintiff Brett Gloss has worked for the FBI for over 10 years. He has always received positive performance reviews and awards and has never received a negative review or been the subject of an internal review or investigation. He filed a request for a religious accommodation to be exempt from the vaccine mandate after learning about the mandate in October 2021. The COVID-19 vaccination is diametrically opposed to his beliefs as a practicing Christian, principles which he adheres to in his daily life. Like many others who objected to the vaccine on religious principles, Mr. Gloss was forced to disclose his deeply help personal beliefs to superiors to keep his job. He suffered from anxiety and stress and has experienced severe hostility in his work environment because of his religious beliefs.

41)     Plaintiff Ivan Gutierrez objected to the vaccine mandate because of his sincere Christian beliefs that he should not subject himself to a vaccine that was tainted by aborted fetal cells. He felt tremendous pressure to take the vaccine and was fearful of the consequences to him and his family if he didn't. He filed a request for an accommodation to exempt him from the

vaccine mandate. Because he did not take the vaccine he was forced to test regularly, waiting in long lines and having to upload test results. He asked his supervisor why he was required to test to "protect" vaccinated employees, yet vaccinated employees (who were also contracting and spreading COVID-19) were not required to test to protect him. Her response was simply that it was a policy put in place by leadership and they were required to follow it. He felt publicly shamed by his coworkers because of his religious beliefs and was shunned by some who would not even stand near him.

42)     Plaintiff Warren Jenkins has been employed by the FBI for over eight years with a solid performance record. The vaccine mandate is opposed to his Christian religious beliefs. As such, he filed for a religious exemption on September 21, 2021, to avoid being compelled to take the vaccine. He filed his request under duress, having been threatened by the FBI with discipline up to and including removal from office if his accommodation was not granted. Because he was prohibited from taking the vaccine, he was subject to testing, masking, and social distancing that was not required of employees who did not share his religious objections. He witnessed employees who came to work suffering from COVID-19 symptoms, but who did not have to test or quarantine because their religious beliefs did not prohibit them from taking the vaccine. He was forced to put his most personal and private religious beliefs in writing and because of this treatment suffered stress and harassment in his workplace.

43)     Plaintiff Bradley Johnson was a Supervisory Special Agent with the FBI's Operational Technology Division with a positive performance record of good service. As a man of faith, he believes that all mankind is created by God and that use of the vaccine is an offense to God. Accordingly, he filed for a request to be exempt from the vaccine mandate, as well as the testing and masking mandates (required only of non-vaccinated employees) to defend his

religious faith. As an Advance Law Enforcement Rapid Response Instructor, he was required to be SWAT-certified and to be a Firearms and Tactical Instructor. Because his religious beliefs prohibit him from taking the vaccine, his Unit Chief told him that "you will not provide any training, you will not receive any training." He was denied work-related and training-related travel and was required to test and mask, when employees who did not share his religious beliefs were not required to do so. This occurred despite many vaccinated employees testing positive for COVID, including the Assistant Director of HR and many Section Chiefs. Mr. Johnson and other employees with religious objections to the vaccine mandate were called out in meetings as the cause of the masking requirements and their personal health information seemed to be "common knowledge."

44)     Plaintiff Monte Keiper is a special agent based in Chicago who objected to the COVID-19 vaccine on religious grounds. Mr. Keiper was ordered to quarantine on several occasions between November 2021 and January 2022. He was quarantined not because he contracted COVID-19 but because he was exposed to others who contracted the disease. His division told him exactly when to quarantine and for how many days. Yet on January 20, 2022, he was removed from his SWAT duties for 30 days because he "had too many "Administrative leave days." His Special Agent in Charge told him that the suspension was solely because of the time he was away from the office (ironically on quarantine the FBI required) and that it had nothing to do with his vaccination status. However, his supervisors knew about his vaccine status, and one even told him that he agreed with the 30-day suspension but would have "concurred with the suspension for COVID safety reasons to protect the SWAT team and the public until [he] was in compliance with the FBI/DOJ."

45)     Plaintiff Scott LeMaster is an 18-year veteran of the FBI with a good performance

record. He filed a religious accommodation request on October 21, 2021 to be exempt from taking the vaccine, which he believes was a coercive measure designed harass him into violating his fundamental religious rights. He has not received a response to his request for accommodation to date, yet FBI declared him AWOL on several different occasions (for a total of approximately seven months) for failure to test after declining the vaccine. During these periods FBI forcibly expended his annual leave, sick leave, and eventually go into unpaid status. Employees who did not share his religious beliefs and who were contracting and spreading COVID-19 were not required to test and report testing results. Mr. LeMaster has suffered severe stress and anxiety because of the fear of losing his job, being denied telework, and enduring endless coercion and shame from Defendants.

46)     Plaintiff Scott McGlothin entered duty with the FBI in 2005. He currently serves as an Engineering Technician within the Operational Technology Division of the FBI. He filed a request for a religious accommodation on October 12, 2021, and was thereafter subject to weekly COVID-19 testing as a result. Only employees who filed for religious or medical accommodations were required to engage in testing and related "safety protocols." He was "ordered off FBI property and placed on AWOL status" on December 13, 2021, through March 4, 2022, when protocols changed to reflect CDC COVID community level rates. On May 13, 2022, Mr. McGlothin filed a second request for an accommodation to the testing protocol, given his sincerely held Catholic faith. Mr. McGlothin was again put on AWOL status and ordered off FBI property that day when infection rates rose to medium and the "safety protocols" were reinstated. Around May 22, 2022, he received a denial letter regarding his religious accommodation request. On August 24, 2022, Mr. McGlothin was allowed to return to work as protocols changed again and allowed those with sincerely held religious beliefs to be on property

without proof of a negative test. However, upon return, Mr. McGlothin was relieved of his

program responsibilities and required to train his replacement.

47)     Plaintiff Ty Morrison is an FBI agent in the Miami Field Office. As an objector to

the vaccine based on his Christian religious beliefs, he was subjected to the coercive mandatory

testing and other "safety protocols" required of employees with religious objections to the

vaccine – but not of employees with no such objections. Mr. Morrison's private medical

information became known among people in his chain of command who had no need to know

and because of his office's lack of discretion in handling such information, everyone in his office

knew his religious beliefs prevented him from vaccination. Leaders who were trying to coerce

him into getting the vaccine questioned his integrity several times, and he was ostracized by

those in his office, some of whom did not even want to stand near him. Mr. Morrison suffered

stress at the treatment he received, and particularly under the threat of losing his job. He filed for

a religious exemption from the vaccine but understood that if his accommodation was not

approved, he would be removed from service.

48)     Plaintiff Garret O'Boyle has been a Special Agent with the FBI since 2018. He is

a former police officer, SWAT team member, and Army veteran who had year-long deployments

to Afghanistan and Iraq. He received the highest performance rating possible with the FBI, and

prior to COVID-19, felt confident he had a promising career ahead with the FBI because he was

selected for a new surveillance team. When Mr. O'Boyle learned of the vaccine mandate, he

filed a request for a religious accommodation on October 12, 2021. He received confirmation

that his request was received and that a Reasonable Accommodation Program Coordinator would

be assigned to his case within three days; however, he never received any further communication

about his request. There was no interactive process, and the Agency did not follow the decision-

making protocol. The request he completed was a new, more onerous request form which was used only for religious accommodation requests regarding the COVID-19 vaccine, and it continued to evolve over time. He was required to test and upload results within 72 hours of being on FBI property (which typically meant testing several times per week), mask, and social distance. Failure to do so would result in employees being sent home and considered AWOL. Division heads received lists of "dissenters," those who objected to the vaccine or failed to upload test results. Employees with no religious objections to the vaccine were not required to follow these protocols, even though it was known that vaccinated employees could contract and transmit the disease. Mr. O'Boyle complained to his leadership about his disparate treatment at the end of 2021 and filed an EEOC charge in January 2022. In September 2022, he was suspended from duty for reasons, according to the FBI, "unrelated" to his complaint.

49)     Plaintiff Ann Parrillo is a 19-year employee of the FBI in good standing. She was promoted to Tactical Specialist (TS) Staff Operations Specialist in April of 2014. On October 11, 2021, after learning that she was required to be vaccinated or face dismissal, she filed a request for a religious accommodation to be exempt from the vaccine mandate. She states, "the COVID-19 vaccination is diametrically opposed to my sincerely held personal Christian beliefs as a practicing Catholic and the faith-based princip[le]s that I adhere to in my daily life." Like many others who objected to the vaccine on religious principles, Ms. Parrillo was forced to disclose her deeply help personal beliefs to superiors to keep her job. She suffered from anxiety and stress and has experienced severe hostility because of her religious beliefs at her workplace.

50)     Plaintiff Sundanah Parsons has been with the FBI since 2009. He is currently based in Tampa Florida as a Principal Firearms Instructor, responsible for firearms and tactical training for all FBI agents in the middle district of Florida. In his 14 years of service with the

FBI, Mr. Parsons has been an exemplary employee and has never received a negative performance review. Because of his sincere religious beliefs, he filed a request for a religious accommodation as an exemption to the COVID-19 vaccination mandate on October 18, 2021. Mr. Parsons had requested and received exceptions to various vaccine requirements since he was in grade school. He prayerfully considered whether to take the COVID-19 vaccination but felt that it was not consistent with his sincerely held Christian religious beliefs. Nineteen months after filing his request for an accommodation, he still had not heard anything. He contacted the coordinator in charge of his claim but got no answers as to why the request was not processed, or why there was no interactive process or any conversation whatsoever about how to resolve his claim. This despite being told he would get "exceptional, professional and timely service" from the coordinator. When he inquired with her FBI leadership about why Taskforce Officers (non-FBI employees) who worked in the same capacity as her, the same location, and the same hours, were not required to endure the "safety protocols" like FBI employees who objected to them on religious grounds, he was told to seek counseling and merely "comply" with the mandate since failure to do so would result in AWOL status, counseling, and potentially relief of duty. Mr. Parsons was humiliated and demeaned when he was required to take the COVID-19 test on camera (FaceTime) in front of his supervisor.  He filed a claim of discrimination with the EEOC, which was denied, even before he could provide additional information supporting his claim. Notwithstanding his discriminatory treatment, his "goals and intentions when joining the FBI were to uphold the Constitution and to protect the citizens of the USA, which [he] will continue to do to the best of [his] ability."

     51)    Plaintiff Daniel Saavedra has worked for the FBI since 2019. He is a Marine Corps veteran and prior to the FBI was a police officer. He is a devout Catholic who firmly

believes that abortion is morally wrong and goes against God's will. As such, he submitted a request for an accommodation to avoid having to take the vaccine which involved the use of aborted fetal cells. Mr. Saavedra was required to attest to his vaccination and participate in other "safety protocols" such as testing and masking, and like many other Plaintiffs was subject to constant judgment-laced questioning about whether he was vaccinated, which one he took, etc. The work environment became uncomfortable and was riddled with unwanted hostility against those who did not share his religious beliefs against the vaccine.

52)     Plaintiff Robert Scott has been employed by the FBI for six years and has received many performance awards. He filed a request for a religious accommodation to the vaccine that was never adjudicated. His sincerely held Christian faith precludes him from taking the vaccine. Like others, he made the accommodations request under threat of losing his job, which outcome was made clear in communications from the DOJ and FBI. He was forced to share his most intimate religious beliefs with the government, in writing, to maintain employment. The stress from the experience of being compelled to apply for an accommodation, as well as the constant fear of it not being approved, caused significant stress and anxiety, and subjected him to hostility in the workplace.

53)     Plaintiff Andrew Sellers is a Supervisory Special Agent Bomb Technician. He is a veteran and a devout Christian, who was raised in Christian schools, attended Christian college and has strongly held religious beliefs. Because he believes God created all of us in the womb, he objects to any vaccine that used fetal cells in its development. In fact, Mr. Sellers took one dose of vaccine when it first came out, but declined to get another vaccine once he learned about its origins and how it violated his religious faith. He filed a request for an accommodation which his organization acknowledged on October 28, 2021. Since that time until today he has received

no further communication about his request. Mr. Sellers has been threatened with discipline and termination for his beliefs which prevent him from becoming fully vaccinated. He has been living in fear for his family of five and his livelihood, being required to test for COVID-19 every 72 hours, on his own time, with his own money, waiting in urgent care centers for hours while being exposed to people with the disease. He has suffered immense personal stress and uncertainty as he has tried to honor God and his faith in the midst of coercive and harassing tactics used the government to get people vaccinated at all costs. He was required to attest to his vaccination status, not knowing where the information was going or who was going to review it and was forced to disclose his wife's medical condition when she became ill. Mr. Sellers has suffered actual harm as he has lived in fear for his future for several years. The stress of the mandate has impacted him physically and mentally, costing him time and money, and impacting his relationships and future job prospects.

54)     Plaintiff Kyle Seraphin was a Special Agent in the FBI's Albuquerque, New Mexico, Field Office. He requested an exemption from the vaccine mandate in September 2021, because of his closely held religious beliefs. That request is still pending. He also submitted an exemption from testing because of his religious beliefs which was denied in December 2021. Mr. Seraphin was frequently denied the ability to work, requiring him to use his annual and sick leave. He was placed on AWOL status and was suspended with 10 months lost pay. Given the untenable work environment, Mr. Seraphin was forced to resign his position.

55)     Plaintiff Lance Shakespear is a 14-year employee at the FBI. He has a good performance record and has never received a negative performance review. Like other Plaintiffs, he received a notice from the FBI's HR Department on October 28, 2021, that employees would be required to report vaccination status beginning November 2, 2021. That notice stated that

failure to attest would result in "formal counseling," and that a "formal counseling letter" would be placed in their records for purposes of documenting progressive discipline. His religious beliefs required him to decline the vaccine. He consequently submitted a religious exemption form and was soon subject mandatory testing, masking, and distancing, but never heard back. The stress of potential discipline and / or job loss while waiting for an accommodation that never came, as well as the onerous protocols of regularly testing and uploading test results, took a toll on Mr. Shakespear. His wife was pregnant with their first child and he lived in fear that he would not be able to provide for his family. He suffered extreme anxiety and trauma, all while simply trying to abide by his religious beliefs, do his job, and care for his family.

56)     Plaintiff Christopher Toompas is a former marine who has worked at the FBI for 5 years. He has never received a negative performance review and has received multiple awards for work accomplishments including acknowledgements from senior officials. He refused to take the COVID vaccine pursuant to his Christian religious beliefs and further refused to submit an exception request because he believed that requirement validated what he considered to be a "tyrannical mandate," in and of itself. Because of his sincerely held beliefs, he was suspended without pay indefinitely in November 2021, and became the subject of an investigation for his social medial posts related to the vaccine mandate. He lost his security clearance, and his activity was labeled "anti-government activity." Mr. Toompas was terminated by the FBI on May 24, 2023 as a direct result of his religious beliefs.

57)     Plaintiff Brian Toy has been a Special Agent with the FBI for 12 years. He is a Task Force Coordinator with the job of addressing gang violence and other illegal behavior. He has a positive performance record, receiving numerous financial acknowledgements for his outstanding service. His deeply rooted Christian beliefs teach him to oppose abortion as the

murder of a human being. Because COVID-19 vaccines utilized aborted fetal cells in research and development, he could not in good conscience take the vaccine. Accordingly, he submitted a reasonable accommodation request on September 23, 2021. Although the FBI received the request, it never issued a decision. On October 7, 2021, Mr. Toy received an email from HR stating that the vaccine attestation requirement applied only to FBI employees, not contractors or Task Force Officers (employees of other agencies who were deputized to work for the Bureau but not employed by the Bureau). Out of 18 people in Mr. Toy's workspace, only six were FBI employees. None of the remaining 12 people were required to comply with the attestation requirement. On Nov. 17, 2021, the OEEOA stated, "those who have completed the required vaccine attestation and requested a reasonable accommodation, no disciplinary action will be taken until an HR decision has been rendered." This statement created fear and anxiety for those who had applied for a religious accommodation to know that it was only a matter of time before they faced discipline and / or termination if they were not accommodated. The November 17 communication also stated, "all employee[s] seeking a reasonable accommodation were required to follow certain safety protocols. . . " Those included masking, testing within 72 hours of reporting for duty, and social distancing. Mr. Toy was prohibited from attending training and traveling because of his religious beliefs, which are crucial activities for developing career and promotional potential.

58)      Plaintiff Anthony Tran has been employed by the FBI since 2010. Since 2019 he has been a Staff Operations Specialist in the Las Vegas Field Office. He has consistently received positive performance reviews and numerous spot awards during his service. Mr. Tran applied for a religious accommodation to be exempt from the vaccine on September 17, 2021, because of his strongly held religious beliefs. His request was never resolved. As a result, he was

required to engage in masking, testing, and social distancing protocols. These protocols were applied inconsistently amidst conflicting guidance. Furthermore, local norms varied from official policy.

59)     Plaintiff Jose Villela is the Putative Class Agent. He is a Special Agent with the FBI, where he has been employed for 26 years. His deeply held Catholic beliefs prevented him from taking the vaccine. As an active, practicing Catholic, he objects to the vaccine as morally wrong given that its development and production was tainted by fetal cells from identifiable aborted babies. He believes human life is sacred and is formed in the womb by God. As such, he believes abortion is a sin and therefore he cannot participate in any activity involving aborted children. He also believes that the compulsory vaccination and testing violate his religion because by nature they were coerced and not voluntary. Like other Plaintiffs, he was subject to "safety protocols" for declining to take the vaccine and was subject to mandatory testing, masking, social distancing, and reporting. He was threatened with AWOL status if he did not upload a negative COVID-19 test at frequent, regular intervals. The documentation related to his vaccination status became known to many in his organization, including leadership who had no need to be party to such information. Indeed, there became a clear and public demarcation in his office as to who was vaccinated and who held religious beliefs opposing the COVID-19 vaccines. As such, Mr. Villela he suffered harassment and ridicule for his religious beliefs.

60)     Plaintiff Mary Beth Wright is a Special Agent and a member of the FBI's Evidence Response Team in its Houston division. She is married to Plaintiff Patrick Wright and has worked for the FBI since 2008. Mary Beth holds "deep religious […] objections to the COVID-19 vaccinations because of its creation, testing and using human cell lines derived from aborted babies." Accordingly, her religious beliefs prevent her from using the vaccine. She was

required to file a religious exemption to the vaccine, which she did on October 7, 2021, to keep

her job. On October 12, 2021, (the due date for all exemption requests), Ms. Wright was notified

that the form had been completely revised and that she was required to fill out the new form,

which included more questions than the first form, many of which were intimidating, invasive,

unnecessary, and unrelated to the COVID-19 vaccine. The experience left Ms. Wright feeling

harassed, intimidated, bullied, and mocked.

61)     Plaintiff Patrick Wright is married to Plaintiff Mary Beth Wright and has also

been employed with the FBI since 2008 as a Special Agent Bomb Technician in Houston. Like

his wife, he has a good performance record and shares her same religious beliefs. He experienced

the same heavy-handed, intimidating coercion by the DOJ and the FBI that his wife experienced

and likewise felt intimidated and harassed by the Defendants' conduct.

62)     Plaintiff Patrick York has been employed by the FBI for 14 years. He is assigned

to the Houston Division, Texas City Resident Agency. He has never received a negative

performance evaluation and has received many awards and acknowledgements for his

achievements. He is a Violent Crimes Investigator with additional duties such as being a Tactical

and Defensive Tactics Instructor and is a Special Agent Bomb Technician in Training. Like other

Plaintiffs, Mr. York was threatened with disciplinary action up to and including removal from his

position if he did not take the vaccine without an approved religious accommodation. Mr. York's

religious beliefs prevent him from taking the COVID-19 vaccine, for which he filed a religious

accommodation request. The accommodations process was changed from the standard process

however, just four days before the filing deadline. It included the addition of several onerous and

invasive questions that religious believers were required to complete and share with their

leadership. Shortly after he filed his request (complete with answers to all the new questions), the

instructions for the accommodations request form were changed to indicate that completion of all questions was not necessary. It "encouraged" employees however, to provide as much information as possible to enable the agency to evaluate the request. Notwithstanding his completed submission, his request for an accommodation was never resolved.

63)     Defendant Federal Bureau of Investigation (FBI) enforces federal law, and investigates a variety of criminal activity including terrorism, cybercrime, white collar crimes, public corruption, civil rights violations, and other major crimes.

64)     Defendant Department of Justice is a federal executive department of the U.S. Government responsible for the enforcement of federal law. Its mission is to "uphold the rule of law, to keep our country safe, and to protect civil rights."

65)     Defendant Chrisopher Wray is the Director of the FBI. He is sued in both his official and individual capacities.

66)     Defendant Merrick Garland is the Attorney General of the United States and oversees the Department of Justice. He is sued in both his official and individual capacities.

**STATEMENT OF FACTS**

Vaccine Mandate

67)     COVID-19 was declared to have reached pandemic status in March of 2020.

68)     On January 20, 2021, President Biden issued EO 13991, which established a Safer Federal Workforce Task Force (the "Task Force") and required masking and social distancing for all federal employees. The Task Force was charged with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. 7045 at

7046.

69)     On May 14, 2021, DOJ issued guidance revoking the requirement that vaccinated federal employees need to wear masks and social distance. Lofthus, Lee J. email to FBI-ALL. May 14, 2021.

70)     As early as August, 2021, it was public knowledge that while the vaccine worked well in preventing severe illness and death, it did "not prevent transmission," particularly as it related to the Delta variant, which comprised 93% of all cases at the time.[4]

71)     Yet on September 9, 2021, the President issued Executive Order ("EO")14043, which required all federal employees to be vaccinated, subject to such exceptions as required by law." 86 Fed. Reg. 50989. EO 14043 tasked every federal agency with implementing the EO to the extent consistent with applicable law, *Id.* at 50990. The Agencies were to receive "implementation" guidance from the Task Force, which would issue guidance within seven days. *Id.*

72)     Simultaneously, the President stated that while "fully vaccinated" individuals are "highly protected from severe illness even if [they] get Covid-19," and being fully vaccinated renders these individuals "as safe as possible," he was nonetheless issuing vaccine mandates "to protect vaccinated workers from unvaccinated co-workers."[5]

73)     In reality, given that the vaccine did not protect co-workers from spread of the disease, this rationale was unfounded. However, it underpinned the decisions and actions of Defendants for the next year and a half.

---

[4] Holcombe and Maxouris, *CDC head says COVID-19 vaccines prevent severe illness and death, but they can't prevent transmission,* CNN.com, (August 16, 2021), at https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33.
[5] Katie Rogers & Cheryl Gay Stolberg, *Biden Mandates Vaccines for Workers, Saying, 'Our Patience Is Wearing Thin,'* New York Times, (September 9, 2021, updated November 12, 2021), at https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html.

74)     DOJ implemented the President's mandate on Sept. 13, 2021, when Assistant Attorney General for Administration ("AAG") Lee J. Lofthus sent an email to all DOJ employees which was forwarded to all FBI employees ordering them to comply with the President's mandate no later than November 22, 2021. Lofthus, Lee J. email to FBI-ALL, September 13, 2021.

<u>Lack of Reasonable Accommodation Process</u>

75)     Lofthus sent another email on September 17, 2021, in which he stated that failure to meet the Nov. 22, 2021, deadline for full vaccination would subject employees to "possible disciplinary action, up to and including removal from federal service," unless employees secured an exemption through the reasonable accommodations process. *Id*.

76)     Employees who objected to taking the vaccine were on clear notice that they would lose their jobs if they failed to secure a religious exemption. This threat created significant anxiety and stress for employees who just wanted to be left alone to serve their country proudly and to follow their private religious beliefs.

77)     The FBI implemented the vaccine mandate and in doing so, attempted to create a new process for requesting and adjudicating religious accommodations (i.e., exemptions from the vaccine mandate), which was separate from its existing processes for requesting accommodations. The FBI required reasonable accommodation forms be submitted by October 12, 2021.

78)     The new process added multiple new questions which required answers. These questions inquired more deeply into employees' personal and private beliefs and actions and were more burdensome than the standard process. Some of the questions did not even relate to the COVID-19 vaccine.

79)     Shortly after the accommodation forms were due, the FBI changed the language on the form to note that, "[you] do not need to answer every question to be eligible for a religious exception, but we encourage you to provide as much information as possible to enable the agency evaluate your request." This language was inserted the same day as the deadline for filing, so most employees answered every question under duress. Even the new language, however, was coercive, since employees knew that if their requests were not granted they could be removed from the agency.

80)     On November 17, 2021, the Office of Equal Employment Opportunity Affairs (OEEOA) sent a communication to all FBI employees purporting to inform them about how the accommodations process would work. FBI-Communications, email to FBI-All, November 17, 2021. It stated that it had received over 2500 requests for accommodations and that it had assigned individual coordinators to "provide individual assessments" for each request (medical and religious). Employees were told that "[c]oordinators will then contact requesters' supervisors" to see if an accommodation would "pose an undue hardship." *Id.*

81)     The memo went on to note that "[f]or those who have completed the required COVID-19 vaccination attestations and requested a reasonable accommodation, no disciplinary action will be taken until an HR decision is rendered." *Id.* Given that Plaintiff's entire livelihoods and job security hinged on HR's decision, this language was not reassuring.

82)     Employees who filed a request for a religious accommodation to the vaccine mandate were never personally contacted (or even responded to) for the purpose of engaging in an interactive dialogue to determine whether a reasonable accommodation existed that would not be an undue hardship on the Defendants.

83)     Indeed, Defendants could not have shown the exemptions from the vaccine

caused an undue hardship, since they acknowledged that vaccine did not eliminate the spread of the disease, and the workforce had operated using other mitigation measures in the past.

84)     It was not until May 12, 2023, (just days before the filing of this Complaint) that Plaintiffs were notified that because of the President's revocation of EO14043, their religious accommodation requests were now closed, "with no further processing by OEEOA."

85)     At all times throughout these events, the process for filing a request for a religious accommodation request was unclear. The lack of communication or written policy regarding what information would be considered, how their requests would be perceived in light of obvious animus towards those who shared their objections to the vaccine, and what would qualify as an undue burden, meant Plaintiffs filed their request blindly, with no comfort or security that the Defendants sought to protect Plaintiffs' rights or that their religious beliefs were valid or would be honored.

86)     This coercion and fear led to severe anxiety, depression, and other stress-related problems that affected many Plaintiffs' personal and professional lives.

87)     At no time did the Agency remind Plaintiffs or their colleagues that it had a legal (and moral) obligation to provide a reasonable accommodation for their religious objections to the mandate, nor did leadership acknowledge that their objections may be legitimate. Rather, the Defendants focused almost exclusively on ensuring as many employees were vaccinated as possible.

<u>New Safety Protocols for Religious Believers</u>

88)     The same November 17, 2021, email from FBI Communications informed Plaintiffs that "employees seeking a reasonable accommodation," were required to adhere to new "safety protocols" (masking, distancing and testing), effective Nov 24, 2021. The new protocols

were not directed to the "unvaccinated," rather they were specifically directed to "employees seeking a reasonable accommodation, whether partially vaccinated or unvaccinated" These were protocols, which employees who did not share Plaintiffs' religious beliefs (and who were not seeking a medical accommodation) were not required to follow, notwithstanding that it was widely known vaccinated employees were contracting and spreading COVID-19.

89)    Further, these "safety protocols" were ordered, notwithstanding that Plaintiffs still did not know how their accommodation requests would be adjudicated or when they might expect a determination. It turns out they were never given a decision as to the vaccine mandate until May 12, 2023.

90)    Per the November 17, 2001, memo, Plaintiffs were required to engage in compulsory testing every 72 hours and "show proof of a negative COVID-10 test before entering Federal space or reporting for duty." They were compelled to attest to their vaccination status by reporting it in a web-based portal called MedLink. As of December 13, 2021, the requirement was updated to testing every 7 days.

91)    In the memo, the OEEOA stated for "those who have completed the required vaccine attestation and requested a reasonable accommodation, no disciplinary action will be taken *until an HR decision has been rendered*." (Emphasis added). This statement created fear and anxiety for those who had applied for a religious accommodation, as they had no information, encouragement, or confidence that their requests were going to be properly adjudicated, even though their jobs were on the line. In the meantime, they were forced to undergo physically invasive and painful testing.

92)    A follow-up notification was sent on Nov. 24, 2021, warning, "Employees who do not have proof of a negative C19 test. . . are not allowed in the office and will be charged

Absent Without Leave (AWOL)." AWOL is an unpaid leave of a disciplinary nature, which is for serious misconduct that can result in summary dismissal. Unlike other types of leave, and although it was forced upon Plaintiffs involuntarily, it is a leave that is normally a "period of absence disapproved by a supervisor." Leave Policy Guide 3.15.1

93)     Employees were also threatened with further punitive action up to and including termination. This communication did not acknowledge religious accommodations for those objecting to the testing mandate or the existence and legitimacy of such beliefs. Accordingly, this threat rendered anyone who had a religious objection to the testing mandate with violation of policy and subjected them to being placed on AWOL status.

94)     The testing itself was onerous, invasive, physically uncomfortable or painful, and inconsistent with CDC guidelines, which recommended testing only when symptoms were present, or individuals were exposed to an infected person.[6] Employees were initially required to test outside of work, including waiting in long lines in clinics and being required to submit claims to their insurance, despite guidance from The Safer Federal Workforce taskforce requiring agencies to pay for testing. Once they were permitted to use at-home tests, they still had to take time outside of their day to conduct the test itself and upload the results on the portal. In some cases, when results were still pending, Plaintiffs were required to take personal leave until final results were available.

95)     Plaintiffs who declined to engage in testing were placed on AWOL status, notwithstanding that their religious accommodation requests were still in limbo. For example, members of the FBI's SWAT Team who had religious objections to the vaccine were made

---

[6] Overview of Testing for SARS-CoV-2, the virus that causes COVID-19, CDC.gov, at https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html#:~:text=People%20who%20have%20had%20an,CDC's%20COVID%2D19%20isolation%20guidance.

operationally inactive from collateral duty on the Tactical Operations Center, rendering them unable to respond during operational or critical incidents.

96)     Notably, employees who also submitted a religious request for accommodation from the testing requirements (in addition to a request to be exempt from the vaccine mandate) did receive a determination within short order. In each case, their accommodation request was denied, and they were placed in AWOL status because they could not return to work.

<u>Different Treatment – Arbitrary and Capricious Policy</u>

97)     Defendants separated employees with religious and medical objections to the vaccine from those who did not have those objections. They created a clear and public demarcation between the two groups that was used not only to shame and humiliate employees with religious objections, but to enable different treatment between the two groups. Defendants created a new and unusually onerous process for seeking accommodations, which was used *only* for purposes of employees objecting to the COVID-19 vaccine – not for any other vaccine or religious objection. And they created arbitrary and capricious protocols that only employees with religious or medical objections to the mandate were made to comply with under threat of discipline and removal. The fact that employees without such religious or medical objections could and did get sick and did transmit the disease throughout the period in question, belies the argument that such measures were mere safety precautions, in place to "protect vaccinated workers from unvaccinated workers." Employees who had no religious beliefs preventing them from taking the vaccine were not required to test, even after returning to work after getting sick with COVID-19.

98)     Moreover, the October 7, 2021, Human Resources Branch memo to all FBI

employees declared that the new vaccine attestation requirement "does not apply to contractors, TFO's [Task Force Officers] or detailees," who work with the FBI but are employed by other agencies or private companies. Indeed, contractors were not required to provide a negative test before entering FBI facilities and would not be subject to a vaccine requirement until months later, in January 2022. Accordingly, the notion that granting vaccine exemptions to employees with religious objections would be an undue burden on Defendants is nonsense. In the case of Plaintiff Brian Toy, two-thirds of the co-workers in his same office space were not employees, and were neither required to be vaccinated, nor provide a negative COVID-19 test before coming to work. Surely contractors (and even fully vaccinated employees) were spreading COVID-19 whether vaccinated or not. Likewise, Plaintiff Scott McGlothin worked in a location where only 3% of employees were required to test (those who requested religious or medical accommodations) when 100% of the employees could spread the disease.

<u>Harassing and Hostile Work Environment</u>

99)     Plaintiffs received both official and unofficial communications pressuring them to violate their religious beliefs and "do the right thing" by getting vaccinated.

100)     Social pressure from co-workers increased and Plaintiffs were publicly and humiliatingly "outed" and shamed into wearing ineffective masks and testing in front of others, blatantly signaling to colleagues that there was something wrong and "other" about them.

101)     Plaintiffs felt pressured and harassed into complying, and many feared raising additional objections about testing (on top of their vaccine objections) would ostracize them even more and further jeopardize their jobs.

102)     Plaintiffs were intimidated, ridiculed and insulted by the Defendants and its

employees.

103)    These frequent actions by leadership and vaccinated employees shamed the employees who had religious objections to the vaccine, leaving them feeling like pariahs; unclean, less than, demeaned, and ostracized.

104)    The conduct was severe and pervasive, occurring daily and weekly over many months.

105)    These official communications and many others fostered a hostile work environment, where ridicule in daily conversation pervaded the Bureau, sending the clear message that those with disfavored religious beliefs were unwanted and that their beliefs were unwanted.

106)    The Agency sowed division in the workplace between vaccinated employees and those with religious objections to the vaccine. As a result, many leaders and co-workers who disagreed with their religious beliefs about the vaccine mocked, singled-out, shamed, and shunned Plaintiffs.

<u>Other Adverse Actions</u>

107)    In addition to being treated differently by policy, Plaintiffs suffered numerous adverse employment actions.

108)    Many were prohibited from getting temporary assignments or traveling, even when traveling was required for their jobs.

109)    Some Plaintiffs were denied training and career opportunities and / or lost job responsibilities.

110)    Some were required to take accrued leave rather than return to work because their testing results were delayed.

111)    Many were put on "naughty lists" of employees who were not vaccinated and / or who had not complied with testing requirements and many Plaintiffs had notices placed in their personnel files.

112)    Some Plaintiffs were reassigned multiple times and denied the opportunity to use accrued leave.

113)    Others were required to use accrued leave and then punished for taking too much leave when their accrued leave ran out.

114)    Many Plaintiffs were placed on AWOL status.

115)    At least one employee suffered bloody a nose from all 15 tests she took (each of which was negative).

116)    Many Plaintiffs had their private medical information disclosed without consent.

117)    The Department used duress, intimidation, and coercion to force Plaintiffs to give up their religious convictions and just "get the jab."

118)    Defendants never cobbled together a clear policy and procedure for filing a religious accommodation request but had a clear policy of progressive discipline for failure to take the vaccine, indicating their unwillingness to accommodate religious belief.

119)    Plaintiffs were repeatedly threatened with disciplinary action, including AWOL status or termination if they did not test, mask, or take the vaccine.

120)    Plaintiffs suffered severe emotional harm, and some were forced to go on medication and / or seek physical or mental health support because of the stress and pressure from leadership and coworkers.

121)    Several Plaintiffs were forced to resign or retire because of the oppressive and hostile work environment and the fear of termination.

122)    Many Plaintiffs had to take leave to deal with the stress and anxiety of the work environment and the threats of termination, as well as look for new jobs and new homes in order to leave the Department prior to termination.

123)    Many Plaintiffs suffered marital and family discord.

124)    Many Plaintiffs got repeatedly tested for COVID-19 under duress and against their religious beliefs because they felt pressured and bullied by the Department.

125)    Many Plaintiffs were required to conduct the testing on their own time and without pay.

126)    The Defendants did nothing to mitigate either the hostile and discriminatory work environment or the discriminatory acts of its leaders.

<u>Putative Class Agent's Complaint</u>

127)    On January 24, 2022, after seeking EEO counseling on January 10, 2022, Mr. Villela filed a formal EEO charge as a class agent against the DOJ 's implementation of the vaccine mandate.

128)    All Plaintiffs were a party to the class charge.

129)    On January 12, 2023, the EEOC issued its Decision and Order Denying Class Certification and Dismissing Class Complaint.

130)    On February 16, 2023, DOJ issued its "Memorandum Explaining the Final Order."

<u>Recission of the Mandate</u>

131)    On May 12, 2023, just days before the filing of this Compliant, President Biden

implemented a new Executive Order (EO), rescinding EO 14043, thereby revoking the illegal government-wide COVID-19 vaccination mandate for federal employees.

132)     While this was the right action, particularly given that the 5th Circuit Court of Appeals in *Feds for Medical Freedom v. Biden,* 63 F.4th 366 (5th Cir. 2023), upheld the lower court's finding that the President did not have authority to issue the mandate in the first place, after more than a year and half, this recission is too little too late. Harm occurred and it still continues.

## CLASS ACTION ALLEGATIONS

133)     Certification of a class is appropriate in this action, with Plaintiff Jose Villela as the representative class agent.

134)     Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

(a) The class is numerous that joinder of all members is impracticable;

(b) there are questions of law or fact common to the class;

(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(d) the representative parties will fairly and adequately protect the interests of the class.

135)     Here, Plaintiffs meet all four criteria.

## NUMEROSITY

136)     To satisfy the numerosity requirement under rule 23,

> [C]ertification is only appropriate where the class is so numerous that joinder of all members is impracticable. A plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. This court, however, has repeatedly noted that the number of members in a proposed class is not determinative of whether joinder is impracticable. Rather, a number of facts other than the actual or estimated number of purported class members may be relevant to the numerosity question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2019)(citations omitted).

137)     Here, the class includes 38 identified members, with the possibility of many more. A certified class in this case would include all FBI employees who requested a religious accommodation to the vaccination requirement, the testing requirement, or both, and did not receive one. The FBI has approximately 35,000 employees.[7] According to the White House, the federal workforce at large has achieved a 98% vaccination rate.[8] If this applies to the FBI, 700 employees remain unvaccinated. If 50% remain so for religious reasons, the class is at least as large as 350 individuals. Plaintiffs seek discovery to identify the full scope of the potential class in this matter.

<u>COMMONALITY</u>

138)     The standard for commonality is not "high," but merely requires that "the resolution of common questions affect all or a substantial number of the class members." *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 2004 U.S. Dist. LEXIS 8158, *99 (5th Cir. 2004)

---

[7] FBI.gov, *Frequently Asked Questions*, at
https://www.fbi.gov/about/faqs#:~:text=How%20many%20people%20work%20for,type%20of%20national%20police%20force%3F
[8] Executive Order 14,099, 88 FR 30891, (May 9, 2023)["Following issuance of those orders, my Administration successfully implemented a vaccination requirement for the Federal Government, the largest employer in the Nation, achieving a 98 percent compliance rate (reflecting employees who had received at least one dose of the COVID–19 vaccine or had a pending or approved exemption or extension request) by January 2022.]

139)   All that is required for each class is that there is one common question of law or fact: "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" Therefore, the fact that some of the Plaintiffs may have different claims, or claims that may require some individualized analysis, is not fatal to commonality. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001)(citations omitted).

140)   Here, the common questions of fact include the FBI's implementation of the vaccine mandate and its failure to accommodate religious believers who objected to it.

141)   The common questions of law include whether the FBI failed to accommodate these religious believers.

<u>TYPICALITY</u>

142)   Fifth Circuit case law on the question of typicality tends to treat the term according to its common meaning, with denials coming when the putative class agent will suffer from defenses that apply to him, but not the rest of the class. *See*, *e.g.*, *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984), *Garonzik v. Shearson Hayden Stone, Inc*., 574 F.2d 1220, 1221 (5th Cir.1978), cert. denied, 439 U.S. 1072, 99 S. Ct. 844, 59 L. Ed. 2d 39 (1979).

143)   The typicality requirement "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. *Griffin v. GK Intelligent Sys*., 196 F.R.D. 298, 301 (S.D.T.X. 2000).

144)   Plaintiff Jose Villela's interests are aligned with the other members of the class. The policies that gave rise to the harassment and lack of accommodation he suffered are the same as the others in the class, as the policies that gave rise to those harms were FBI-wide policies creating an approach that applied to all individuals who requested a religious

accommodation to the vaccine requirement. His experience was the same experience as other potential class members throughout the Agency.

ADEQUACY OF REPRESENTATION

145)     In the Fifth Circuit, the adequacy of representation analysis "encompasses two separate inquiries: (1) the willingness and ability of the named plaintiff 'to take an active role in and control the litigation and to protect the interests of absentees'; and (2) 'the zeal and competence of the representative's counsel.'" *Guenther v. BP Ret. Accumulation Plan*, 2021 U.S. Dist. LEXIS 63660, *21-22 (S.D.T.X. 2021)(citations omitted).

146)     For the first inquiry, the question is whether "the class representatives must possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation," even though class representatives "need not be legal scholars, and are entitled to work with, and rely upon, their counsel in pursuing their claims and navigating the complicated legal and factual issues associated with complex litigation." A class representative is considered adequate when he has "familiarity with the complaint and with the concept of a class action." *Id.*, (citations omitted).

147)     Jose Villela meets these requirements. He was at all relevant times an FBI employee who requested a religious accommodation that he never received and who experienced the discrimination that other class members experienced. He experienced the same policies, the same communication of these policies, and the same culture that other potential class members experienced. He has furthermore taken an active role in organizing the potential class members, obtaining their statements, making initial contact with counsel and providing all necessary follow-up. He is in all ways adequate to represent the interests of the class contemplated here.

148)     As for the competence and zeal of counsel representing the putative class, counsel

has extensive experience with employment-related class action claims and complex litigation in multiple contexts. In-house counsel at his firm assisting with the case has extensive employment experience at two of the nation's top employment firms and has worked on several class-action cases in that context. Counsel will provide more detail on this point in a forthcoming motion for class certification.

<u>ADDITIONAL CONSIDERATIONS</u>

149)    Rule 23 goes on in subsection (b) to require plaintiffs to identify additional justifications for class certification. Here, class certification is appropriate according to Rule 23 (b)(3).

150)    Here, as indicated in Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

151)    Many of the Plaintiffs named here have already proceeded together as a putative class through the administrative phase.

152)    Relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified. The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed, they fall within definable categories that are easily manageable. A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within the FBI.

## CAUSES OF ACTION

### COUNT I
### TITLE VII RELIGIOUS DISCRIMINATION 42 U.S.C. § 2000e, et seq.:
### FAILURE TO ACCOMMODATE

153)     Plaintiffs restate the foregoing paragraphs as set forth fully herein.

154)     Under Title VII, a plaintiff alleging religious discrimination based on a failure to accommodate:

> Must first set forth a prima facie case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

> *Davis v. Fort Bend Cnty.,* 765 F.3d 480, 485 (5th Cir. 2014)

155)     Once a plaintiff establishes a prima facie case, the burden shifts to the employer "[t]o demonstrate either that it reasonably accommodated the employee, or that it was unable to reasonably accommodate the employee's needs without undue hardship." *Id.* (*quoting Antoine v. First Student, Inc.*, 713 F.3d 824, 831 (5th Cir. 2013)).

156)     The Supreme Court recently clarified that, "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." That inquiry it described as "fact-specific." *Groff v. DeJoy*, 2023 U.S. LEXIS 2790, *28 (2023).

157)     The term "religion" includes:

> All aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

> 42 U.S.C. § 2000e(j).

158)     As the Supreme Court noted:

The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer *not* to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977) (emphasis added).

159)     A belief "can be religious even if it is not acceptable, logical, consistent, or comprehensible to others." *US. v. Zimmerman*, 514 F.3d 851 (9th Cir. 2007). Indeed, the Supreme Court has made clear the deference that is required in cases of religious freedom:

Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." [...] when an applicant requires an accommodation as an "aspec[t] of religious . . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768, 775, 135 S. Ct. 2028, 2034 (2015)

160)     Plaintiffs hold sincere religious beliefs that conflict with Defendants' COVID-19 vaccine mandate and in some cases, its testing mandate. This fact of their faith is self-evident. Plaintiffs risked their careers (threat of job loss, humiliation, placement on AWOL status, loss of travel, training and career opportunities, etc.) to avoid the vaccine and protect their strongly held beliefs. *Res ipsa loquitur*.

161)     Plaintiffs informed Defendants that their sincerely held religious beliefs conflicted with Defendants' COVID-19 vaccine mandate and requested religious accommodations.

162)     Defendants discharged, threatened, suspended, tested, or otherwise subjected Plaintiffs to an adverse employment action because their faith precluded them from taking the vaccine.

163)     Here, Defendants repeatedly threatened Plaintiffs in writing with discipline,

47

AWOL status, and removal from the Bureau if they failed to be vaccinated without an approved accommodation.

164)     If Defendants had processed Plaintiffs' requests for an exemption to the vaccination in any meaningful way, none of these harms would have occurred.

165)     Plaintiffs who refused to test based on their religious beliefs were placed on AWOL status.

166)     Plaintiffs who were put on administrative leave or AWOL had notices placed in their personnel files that would remain and permanently and would impact future career opportunities.

167)     Defendants did act on Plaintiffs' requests to be exempt from the testing mandate, but in EVERY case, their requests were denied.

168)     They acted quickly in denying the testing exemption requests; they did not engage in any meaningful dialogue with Plaintiffs and when the denials were handed down, and they moved immediately to remove Plaintiffs from FBI property and suspend them.

169)     Plaintiffs have made a *prima facie* case of religious discrimination under Title VII.

170)     Moreover, the statutory framework for determining reasonable accommodation requires an interactive process and participation by both the employer and the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") *Id. See also Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982)

171)   "Once an employee makes [an accommodation] request, the employer is obligated by law to engage in an interactive process – a meaningful dialogue." *Equal Emp. Opportunity Comm'n v. Chevron Phillips Chem. Co*., 570 F.3d 606, 621 (5th Cir. 2009) (in the context of a disability).

172)   Defendants neither requested nor proposed that Plaintiffs participate in any discussion to determine fair and legal accommodations for their religious beliefs. Indeed, Defendants appeared to subvert Plaintiffs' accommodations requests in favor of promoting as many vaccines as possible for as many employees as possible.

173)   In this case, Defendants unilaterally declined Plaintiffs' request for an accommodation that would exclude them from testing. Defendants did not engage with Plaintiff's to find an "acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Chevron,* 570 F.3d at 621 (2009). Instead, they summarily denied the claims without any input from the employees.

174)   Defendants' undue delay in creating a process and responding to Plaintiff' requests for exemption from the vaccine was also unlawful. In the context of a Title VII religious discrimination claim, "'a week-to-week, wait-and-see posture' amounts to no accommodation at all." *EEOC v. Robert Bosch Corp.*, 169 F. App'x 942, 945 (6th Cir. 2006) (*citing EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991).

175)   Indeed, both delay and denial of religious accommodation are deemed an "injury" in and of themselves. *Doster v. Kendall*, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 125400, at *10-13 (S.D. Ohio July 14, 2022) (in the context of a Religious Freedom Restoration Act / First Amendment case).

176)   Defendants evaded any sort of "bilateral cooperation," *Ansonia*, 479 U.S. at 69,

(1986), when they delayed deciding on Plaintiffs' accommodation requests. Even though the temporary injunction against the vaccine mandate was in effect, Defendants failed to consider what accommodations might be reasonable or even discuss the matter with Plaintiffs. This delay caused constant anguish for Plaintiffs who knew they could be terminated if their exceptions were not granted. Most Plaintiffs waited over a year and a half to get resolution, which came not from Defendants but from the courts and finally the Office of the President.

177)    Defendants have not attempted to show that accommodating Plaintiffs' religious beliefs would create an undue hardship—a "burden that is substantial in the overall context of [its] business."

178)    Instead, Defendants were aware that the vaccine did not stop the transmission of COVID -19, but still required vaccines of all employees. Those whose religious beliefs or medical issues prevented them from being vaccinated did not need to be forced to engage in supposed "safety protocols" any more than unvaccinated employees. It was no undue burden to allow a small group of religious believers to avoid taking the vaccine or the "safety protocols," since the vaccine did not prevent transmission.

179)    In addition, Defendants could have offered Plaintiff several reasonable accommodations without encountering an undue hardship, including protocols that were in place before the availability of the vaccine.

180)    Indeed, by never speaking to Plaintiffs about what accommodations might work, Defendants completely failed to use the required interactive process and make any attempt to accommodate their religious objections.


**COUNT II**


50

## TITLE VII 42 U.S.C. § 2000e, et seq.
## RELIGIOUS DISCRIMINATION: DISPARATE TREATMENT

181)     Plaintiffs restate the foregoing paragraphs as set forth fully herein.

182)     The Civil Rights Act of 1964 states in relevant part:

It shall be an unlawful employment practice for an employer –

(1) . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a); § 2000e-16(a) (emphasis added).

183)     Under Title VII, "an employer may not discriminate against an employee with respect to her compensation, terms, conditions, or privileges of her employment. *See*, *Dodson v. Morgan Stanley DW, Inc*., 2007 U.S. Dist. LEXIS 85535, *24 (W.D. Wash. 2007)[citing 42 U.S.C. §2000e-2(a)(1).]

184)     "To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that (1) she held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement." *Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013) (*citing Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 499 n.9 (5th Cir. 2001).

185)     Plaintiffs' sincerely held religious beliefs as described herein qualify them as members of a protected class.

186)     Their beliefs conflicted with the mandate to get a vaccine and they informed the

51

FBI via their requests for reasonable accommodation.

187)    Defendants clearly had a policy of progressive discipline for failure to take the vaccine, from "being counseled" to being placed on AWOL status, to removal from the agency.

188)    Plaintiffs who were not placed on AWOL status or removed from service suffered harm. They lived under the constant duress of not knowing whether their jobs would be protected and whether their livelihoods and families would be forsaken. *See Sambrano v. United Airlines, Inc*., No. 21-11159, 2022 U.S. App. LEXIS 4347, 12 (5th Cir. 2022) (holding that plaintiffs who were subject to the vaccine mandate were "subjected to ongoing coercion based on their religious beliefs. That coercion is harmful in and of itself . . .") (*citing BST Holdings, L.L.C. vs. OSHA*, 17 F. 4th 604, 618 (5th Cir. 2021) (holding that Plaintiffs had suffered irreparable harm from being coerced into "a choice between their job(s) and their jab(s)"). *See also Feds for Med. Freedom v. Biden* 2023 U.S. App LEXIS 7018, 43 (5th Cir. 2023) ("[w]hen a regulation is directed at [plaintiffs] in particular and requires them to make significant changes, plaintiffs have suffered an injury to challenge the order even if the Government has yet to elucidate the precise consequences of failing to comply. . . Plaintiffs do not have to identify exactly how the Government will enforce the mandate; it's enough that plaintiffs face the ominous order, "get vaccinated or else." (internal citations omitted).

189)    Plaintiffs experienced myriad other adverse employment actions. For example:

(a) Plaintiffs were frequently threatened with disciplinary action, including being deemed AWOL, being "removed" or being terminated if they failed to get vaccinated.

(b) Plaintiffs who had religious objections to being tested were put on AWOL status after having their accommodation denied. *See Wallace v. Performance*

*Contractors, Inc.*, 57 F4th 209, 221 (5ᵗʰ Cir. 2023) (holding termination and suspension were both tangible employment actions).

(c) Plaintiffs experienced denial of training and development opportunities, including career advancement and the opportunity to receive other assignments.

(d) Plaintiffs were denied travel opportunities, which was fundamental to their jobs.

(e) Plaintiffs were not permitted to be onsite and / or work with colleagues, forcing them from office-wide gatherings and events.

190)     Plaintiffs who declined to accept the vaccine were forced to undergo testing, masking, and other burdensome (and public) protocols. The testing itself was physically invasive and uncomfortable (even painful to some), while at the same time scientifically unjustified.

191)     The Bureau's November 17, 2021, communication to all FBI employees stating that "all employees seeking a reasonable accommodation, whether partially vaccinated or unvaccinated, are required to follow certain safety protocols . . ." This reference to only employees seeking accommodations belies the notion that Defendants were merely distinguishing between the vaccinated and the unvaccinated in its disparate treatment.

192)     Plaintiffs were "outed," humiliated, or otherwise ostracized when the Defendants publicly identified them as employees who objected to the vaccine based on their religious beliefs.

193)     Plaintiffs were forced to use a different, invasive, and at the same time less personal procedure for acquiring religious accommodation, and then received no accommodation at all to the vaccine mandate.

53

194)    The Department fostered a pervasive environment of religious discrimination.

195)    Plaintiffs were qualified for their positions.

196)    Plaintiffs were treated differently than similarly situated employees in that employees who did not assert religious objections to the vaccine (or request a medical accommodation) and related requirements were not terminated or threatened with termination, denied opportunities for travel, training, development, career growth.

197)    Non-objectors were allowed to work onsite and were not required to test, mask or social distance.

198)    Non-objectors were not ostracized, harassed, or demeaned by leaders and coworkers about the vaccine. And non-objectors were not required to use a novel, unclear and invasive process for filing religious accommodations for issues unrelated to the vaccine.

199)    Plaintiffs have suffered emotional and physical distress, mental anguish, loss of reputation, humiliation, embarrassment, and the physical effects associated therewith because of the denial of their requests, and they will so suffer in the future.

200)    Plaintiffs have been threatened with loss of employment, have been disciplined unfairly, have lost promotional and development opportunities, including the financial and other career benefits that accompany a positive career trajectory.


### COUNT III

### TITLE VII 42 U.S.C. § 2000e, et seq.
### RELIGIOUS DISCRIMINATION:
### DISPARATE IMPACT


201)    Even if Defendants did not intend to discriminate against Plaintiffs based on their religious beliefs, the policy they implemented requiring vaccines of all employees had a

disparate impact on employees with religious objections to the vaccine.

202)    Under the disparate impact theory of Title VII:

A plaintiff establishes a prima facie violation by showing that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.

42 U.S.C.S. § 2000e-2(k)(1)(A)(i).

An employer may defend against liability by demonstrating that the practice is job related for the position in question and consistent with business necessity. Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs.

42 U.S.C.S. § 2000e-2(k)(1)(A)(ii), (C). See also, *Ricci v. DeStefano*, 557 U.S. 557, 578, (2009).

203)    In this case, Defendants clearly implemented a supposedly neutral policy requiring COVID-19 vaccines for all employees.

204)    Yet that policy had a disparate impact on religious believers who opposed the vaccine, which was not job related and was not consistent with business necessity.

205)    Alternative means were available to Defendants that would have had less disparate impact on religious believes and still served the Defendants' legitimate needs.

### COUNT IV

### TITLE VII 42 U.S.C. § 2000e, et seq.
### RELIGIOUS DISCRIMINATION:
### HARASSMENT/ HOSTILE WORK ENVIRONMENT

206)    Plaintiffs restate the foregoing paragraphs as set forth fully herein.

207)    Under Title VII, a Plaintiff can establish harassment in violation of Title VII, "by proving, inter alia, that the harassment created a hostile or abusive working environment."

*Harvill v. Westward Communs., L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).

208)     As the Supreme Court noted in *Harris v. Forklift*, 510 U.S. 17, 21 (1993), the

language of Title VII "evinces a congressional intent to strike the entire spectrum of disparate

treatment of men and women in employment, which includes requiring people to work in a

discriminatory hostile or abusive environment," (*citing Meritor Savings Bank, FSB v. Vinson*,

477 U.S. 57, 64 (1986)). The injuries are "not limited to 'economic' or 'tangible'

discrimination." *Id.*

209)     "When the workplace is permeated with 'discriminatory intimidation, ridicule,

and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment,' Title VII is violated." *Id.*

210)     A hostile environment claim "arises when a plaintiff alleges harassment

sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an

abusive working environment."  *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.

1989)(citing *Meritor Savings Bank*, 477 U.S. at 67 (1986).

211)     To determine whether a workplace has become hostile, courts in the 5th Circuit

will look to a "totality of the circumstances," including "the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Lenihan v. Boeing Co.*, 994 F. Supp. 776, 790 (1998).

212)     The religious believers comprising the putative class in this case have suffered

months and years of continuous intimidation, ridicule, and insult because of their religious

beliefs.

213)     Plaintiffs were treated as pariahs, disease-carriers and disease-spreaders,

regardless of whether they actually had COVID-19 at any given time or had contracted the disease in the past and therefore had natural immunity.

214)    Plaintiffs suffered through "outing" experiences such as masking, testing, and forced absence from office-wide work gatherings.

215)    The testing itself was physically invasive and uncomfortable, while at the same time scientifically unjustified.

216)    They were forced to use a different, invasive, and at the same time less personal procedure for acquiring religious accommodation, and many received no accommodation at all.

217)    Many lost opportunities for travel, temporary assignments, and opportunities at career advancement because of their religious beliefs.

218)    Plaintiffs were placed on unpaid leave and AWOL status when they refused to test because of their religious beliefs. *See Wallace v. Performance Contractors, Inc.*, 57 F4th 209, 221 (5th Cir. 2023) (holding termination and suspension were both tangible employment actions).

219)    The Department fostered a pervasive environment of religious discrimination in violation of Title VII of the Civil Rights Act.


**COUNT V**

**TITLE VII 42 U.S.C. § 2000e, et seq.**
**RETALIATORY HARASSMENT**

220)    Even if Plaintiffs' case is deemed not sufficiently severe or pervasive to trigger a harassment claim under Title VII, it is sufficient to raise a claim of Retaliatory Harassment under Title VII.

221)    EEOC Guidance states:

> The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not severe or pervasive enough to alter the terms and conditions of employment.

EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004, Sect. II.B, ex. 17. (Aug 25, 2016) (*citing Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006). *See also Smith v. AT&T Sols., Inc.*, 90 F. App'x 718 (5th Cir. 2004).

222)     Although petty slights and trivial annoyances are not actionable, adverse actions such as reprimands, threats, negative evaluations, and harassment are actionable.

223)     To prevail in a retaliatory harassment claim, a complainant must show that a reasonable person would have found the challenged action materially adverse, i.e., an action that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination in the future. *Id.* (citing *Burlington Northern*) at 53.

224)     Plaintiffs in the instant case suffered clear and explicit threats, reprimands, and other harassment.

225)     Plaintiffs belong to a statutorily protected class based on their protected EEO activity of requesting a religious accommodation and were subjected to unwelcome verbal conduct.

226)     There was a clear nexus between the protected activity (filing for an exception to the vaccine mandate and / or the testing mandate) and the adverse action of the Defendant. For example, Plaintiffs who filed a request for an exception to the testing mandate we immediately asked to leave the office and were not allowed back until they tested. If they failed to test, they were placed on leave and eventually moved to AWOL status.

227)     Plaintiffs were subjected to retaliatory harassment when the Defendants threatened them with disciplinary action, AWOL status, and removal from federal service,

limited their ability to perform their jobs, required a separate, onerous process for filing an accommodation, and myriad of other related activities.

228)    These actions individually and in totality are materially adverse and would deter a reasonable person from engaging in protected EEO activity.

229)    Given the large number of Plaintiffs in this matter alone, many of whom were afraid to speak up, particularly about being required to test in lieu of receiving the vaccine for fear of more retaliation and ridicule, it is hard to see how a reasonable person would not be deterred from engaging in such protected activity in the future.


**COUNT VI**

**TITLE VII 42 U.S.C. § 2000e, et seq.**
**CONSTRUCTIVE DISCHARGE**


230)    Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. *Pa. State Police v. Suders*, 542 U.S. 129 at 141, (2004).

231)    The "general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employer is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is liable for any illegal conduct involved therein as if it had formally discharged the aggrieved person." *Young v. Southwestern Sav and Loan Ass*o. 509 F.2d 140 at 144 (5th Cir. 1975).

232)    "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police*, 542 U.S.at 141 (2004).

233)     In this case, the continuous and heavy-handed threat of being disciplined, being deemed AWOL or being terminated because of their religious beliefs was too much to bear. Several Plaintiffs felt pressure, coercion, ridicule and outright fear of losing their jobs. To gain some sense of control over their personal and professional situations, to protect their faithfulness to their religious beliefs and to protect their livelihoods and their futures, Plaintiffs resigned their employment with Defendants to avoid the unendurable working environment at the FBI.

## COUNT VII

## RELIGIOUS FREEDOM RESTORATION ACT
## 42 U.S.C.S. § 2000bb et seq.

234)     The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C.S. § 2000bb et seq., sets the standards binding every department of the United States to recognize and accommodate sincerely held religious beliefs, including in the military context. *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, (5th Cir., 2022).

235)     As the Supreme Court has noted, RFRA affords even "greater protection for religious exercise than is available under the First Amendment[]" and provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* at 347-358, 350, *citing Holt v. Hobbs*, 574 U.S. 352, 357, 135 S. Ct. 853, 859-60, 190 L. Ed. 2d 747 (2015); 42 U.S.C. § 2000bb-1.

236)     "A government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and

significantly violates his religious beliefs." *Id.* at 350, *citing Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (involving RLUIPA).

237)    Here Defendants have burdened the exercise of religion by forcing religious believers to either take the vaccine or accept painful testing, stigmatizing masking, and social distancing.

238)    Employees whose religious beliefs precluded them from testing were essentially suspended and put on AWOL status. They also lost important professional opportunities, suffered unequal accommodations practices, and were forced to endure a culture of harassment and ridicule because of their disfavored religious beliefs.

239)    In doing so, Defendants have not used the "least restrictive means" possible as other approaches were available and indeed previously utilized. It has not done so in pursuit of legitimate government ends as vaccination did not prevent the transmission of the disease, nor did the masks. Rather they presented plaintiffs with two options: violate their religious convictions or risk their livelihoods and careers.

240)    At the 5th Circuit found in *Navy Seals*, the vaccine would "directly burden [Plaintiffs'] respective faiths by forcing them to inject an unremovable substance at odds with their most profound convictions. This injury would outlast their military service, making the decision whether to acquiesce far more difficult than just choosing between 'their job(s) and their jab(s)'. *Navy Seals* at 350 (*quoting BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

241)    The "vaccine requirements principally compete against [Plaintiffs] faiths and secondarily against their livelihoods. . . These circumstances impose a substantial burden on Plaintiffs." *Id.* at 350.

242)    The Supreme Court has found that the Religious Freedom Restoration Act allows plaintiffs to recover money damages against federal officials in their official capacities. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

**COUNT VIII**

**1ST AMENDMENT TO THE UNITED STATES CONSTITUTION
FREE EXERCISE CLAUSE**

243)    The Free Exercise Clause of the First Amendment of the United States Constitution ("Free Exercise Clause") applies when government action "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (citations omitted).

244)    Under the Free Exercise Clause, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, … it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Id. at 533 (citations omitted). "Official action that targets religious conduct for distinctive treatment cannot be shielded by … facial neutrality," as "[t]he Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id.* at 534.

245)    Here, the Defendants vaccine mandate and the medical examinations and inquiries associated therewith violated the Free Exercise Clause. The Federal Government, including Defendants, purposefully enacted its vaccine mandate to infringe upon or restrict the practices of its employees who objected to receiving the vaccine because of their religious beliefs.

246)     The repeated communications from DOJ and FBI pressuring and coercing employees to take the vaccine and the sham process by which employees could request exemptions shows discriminatory intent. Defendants also exhibited discriminatory intent in adopting the posture of the federal government and the President, which is to promote vaccination, no matter the expense to individual rights.

247)     Defendants' Department-wide vaccine mandate was not justified by a compelling interest, and Defendants failed to narrowly tailor its implementation of a vaccine mandate by ignoring the natural immunity of many of the Plaintiffs and by ignoring other less restrictive approaches. Defendants knew and admitted that both vaccinated employees and those who declined to be vaccinated could spread COVID-19 and had no scientific evidence that employees with natural immunity were more likely to spread COVID-19 than employees who had been vaccinated.

248)     It was public knowledge as early as August 2021 that while the vaccine helped reduce deaths and the severity of symptoms, it *did not* prevent the spread of COVID-19. To the extent that the Defendants may have considered the "public health risk" posed by employees with religious objections to the vaccine, the Defendants were not entitled, in the face of religious opposition to the vaccines, to override an individual's choice to risk the possibility of worse symptoms, death, and hospitalization for themselves, especially since there was no scientific evidence that the vaccine prevented the spread of the disease or the severity of the disease in others. "Plaintiff's First Amendment freedoms are seriously infringed by the [Defendants'] vaccine requirements. *Navy Seals* at 353.

**COUNT IX**

**FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION
DUE PROCESS CLAUSE**

249)    The Supreme Court has recognized that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, (1990).

250)    The Court rooted this principle in the Due Process clause of the Fifth Amendment.

251)    This principle is what makes Defendants' conduct in this episode unlawful. It is using economic power to secure "consent" to an unwanted medical treatment. This is the same type of "consent" that harassers seek from the harassed in the sex discrimination context and should not be permitted.

**PRAYER FOR RELIEF**

252)    Plaintiffs respectfully request that the Court:

    (a)     Compensatory damages for monetary and non-monetary loss;

    (b)     Exemplary and punitive damages;

    (c)     Prejudgment interest;

    (d)     Reasonable attorney's fees; and,

    (e)     Such other relief as law or equity may pertain.

**JURY TRIAL**

A jury trial is requested in this matter.

Dated: July 11, 2023

By:

_____

E. Scott Lloyd
Virginia Bar # 76989
Lloyd · Lemmon, PLLC
15 Chester St
Front Royal, VA 22630
(540) 631-4081
scott@lloydlg.com
*Attorney-in-charge*
*Counsel for Plaintiffs*
**admitted* pro hac vice

**Daniel W. Manning**
State Bar No. 24081018
Southern District State Bar No. 3098098
dmanning@bajb.com
*Local Counsel*

**Michelle K. Dunne**
State Bar No. 12481750
mdunne@bajb.com
Burns Anderson Jury & Brenner, L.L.P.
4807 Spicewood Springs Road
Bldg. 4, Suite 100 Austin, TX 78759
(512) 338-5322
(512) 338-5363 (telecopier)
OF-COUNSEL FOR PLAINTIFFS
*Local Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Department on July 11, 2023.

_____

E. SCOTT LLOYD