# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| FEDS FOR MEDICAL FREEDOM *et al.*, | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) Civil Action No. 4:23-cv-01817 |
| v. | ) |
| | ) |
| MERRICK B. GARLAND *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR CLASS CERTIFICATION**

COME NOW, Plaintiffs and Putative Class Agents José Villela and Kyle Seraphin, by counsel, on behalf of themselves and a putative class of similarly situated employees (together, "putative class" or "class"), pursuant to Federal Rule of Civil Procedure 23(c)(1)(A) and state the following in support of their Motion for Class Certification.

## I. INTRODUCTION

In response to the COVID-19 pandemic, President Joseph Biden issued an Executive Order requiring all two million federal employees to be vaccinated against the disease. Within a few months, Judge Brown of this District issued a preliminary injunction finding that the mandate was likely unlawful. An *en banc* panel of the Fifth Circuit confirmed that finding.

In the meantime, and even after the injunction, those within the Federal Bureau of Investigation with religious beliefs that prevented them from participating in that mandate endured sustained pressure to violate those religious beliefs through a culture of harassment and

humiliation, as well as threats of and actual discipline and termination. Plaintiffs in this case represent a class and two subclasses of individuals department-wide who suffered discrimination.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed a complaint in this Court on May 17, 2023, which they amended as a class complaint on July 11, 2023. The Amended Complaint included counts against Defendants Merrick B. Garland and Christopher Wray in both their individual capacities and their official capacities. It also included claims against the Department of Justice (DOJ) and the Federal Bureau of Investigation ("FBI" or "Bureau") and claims alleging violations under the Religious Freedom Restoration Act (RFRA) and Title VII of the Civil Rights Act.

Both the individual and official-capacity defendants filed motions to dismiss, and this Court heard arguments on April 22, 2024. In a decision dated April 29, 2024, Judge Keith P. Ellison dismissed all claims brought by Feds for Medical Freedom with prejudice. The Court dismissed all claims against individual capacity defendants without prejudice and against Defendant Wray, the FBI, and DOJ with prejudice. Finally, the Court dismissed the claims against defendant Garland in his official capacity with prejudice except Count I (failure to

accommodate) as to Plaintiffs Alexander Bayon, Kimberly Corpora, Rachelle Glenn, Bradley Johnson, Scott McGlothin, and Kyle Seraphin, and Count IV (constructive discharge) as to Malcolm Bezet, Jennifer Geren, and Kyle Seraphin. A claim of disparate treatment by all plaintiffs (Count II) also survives. Finally, the Parties filed, and the Court granted, a stipulation of voluntary dismissal for Plaintiffs James Drohan, Warren Jenkins, Ann Parrillo, Brian Toay, (without prejudice) and Adalbert Bielski (with prejudice).

### III. RELEVANT FACTUAL BACKGROUND

The full facts of this case are contained in Plaintiffs' Amended Class Action Complaint, filed July 11, 2023, incorporated herein. A brief recitation of relevant facts is as follows:

In response to the COVID-19 pandemic, and despite public announcements from the CDC that the vaccine "can't […] prevent transmission," the FBI implemented a COVID-19 vaccine mandate in response to Executive Order 14043 in September of 2021. (Am. Compl. ¶¶ 70-71, 74). Employees who did not meet the Bureau's November 22, 2021, deadline were subject to possible disciplinary action, up to and including removal from federal service. *Id* at ¶ 75. The Bureau set up a religious exemption process that was separate from its previously established process and, as discussed below, received nearly 2,000 requests. *Id* at 77-78, 80.

Beginning on November 24, 2024, the FBI required all employees "seeking a reasonable accommodation, whether partially vaccinated or unvaccinated," to mask, socially distance, and test. *Id* at ¶88. The Bureau required testing every 72 hours, which changed in to once every seven days about a month later. *Id* at ¶90.

The Bureau informed employees seeking accommodation that those who do not have proof of a negative COVID-19 test would be barred from the office and would be considered

absent without leave (AWOL). *Id* at ¶92. The testing was physically onerous and painful, and FBI's testing regime was inconsistent with CDC guidelines, which recommended testing only when there were symptoms or when an individual had exposure to an infected person. *Id* at ¶94. It was also unjustifiable on the grounds that it was there to protect vaccinated workers from unvaccinated workers, as the vaccinated could still get sick and transmit the disease. *Id* at ¶¶ 70-71, 74, 97-98.

The Bureau denied all religious accommodation requests for the testing requirement and placed those who did not take the test on AWOL status. *Id* at ¶96. Religious objectors experienced harassing behavior, intimidation, ridicule, and insult over official communications from leadership and informal communication from co-workers. *Id* at 99-106. They also experienced employment harms: exclusion from necessary travel, denial of opportunity, use of accrued leave, residence on "naughty lists," reassignments, AWOL, disclosure of private medical information, constructive discharge, and a bloody nose from testing in one instance. *Id* at 107-116.

## IV. CLASSES AND SUBCLASSES

The claims that survived a motion to dismiss are (i) a Disparate Treatment claim under Title VII of the Civil Rights Act for all plaintiffs (Count III), (ii) failure to accommodate claims under Title VII of the Civil Rights Act for religious accommodation requests for testing, masking, and distancing protocols for plaintiffs Alexander Bayon, Kimberly Corpora, Rachelle Glenn, Bradley Johnson, Scott McGlothin, and Kyle Seraphin, and (iii) constructive discharge claims under Title VII of the Civil Rights Act for plaintiffs Malcom Bezet, Jennifer Geren, and Kyle Seraphin.

Plaintiffs seek class certification for all surviving counts, as it is their understanding that the treatment they received was a part of a Bureau-wide trend rather than a series of isolated

incidents.

The relevant classes would include:

A class consisting of all plaintiffs to this action and all Bureau individuals who requested a religious accommodation to the vaccine mandate and who the Bureau subsequently required to test, mask, and / or social distance. José Villela is the putative class agent for this class.

    a.  A subclass consisting of plaintiffs Alexander Bayon, Kimberly Corpora, Rachelle Glenn, Bradley Johnson, Scott McGlothin, Kyle Seraphin, and all Bureau employees who requested a religious accommodation for testing and that the FBI refused. Because José Villela is not part of this group, the putative class agent for this subclass is Kyle Seraphin.

    b.  A subclass consisting of plaintiffs who experienced constructive discharge after requesting a religious accommodation for vaccination and / or testing / masking. Because José Villela is not part of this group, the putative class agent for this subclass is also Kyle Seraphin.

## V.   **ARGUMENT**

### A. Standard for Class Certification

Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

1. The class is so numerous that joinder of all members is impracticable;
2. There are questions of law or fact common to the class;
3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
4. The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Additionally, the Fifth Circuit requires that "the class sought to be represented must be adequately defined and clearly ascertainable." *Guenther v. BP Ret. Accumulation Plan*, 2021 U.S.

Dist. LEXIS 63660, *4 (S.D. Tex. March 12, 2021) *citing Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 333 (5th Cir. 2019).

A party seeking certification must also satisfy at least one of the grounds identified in Rule 23(b). In this case, Rule 23(b)(3) applies, as it speaks to situations where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### i. FRCP 23(a)

#### 1. Numerosity

Regarding numerosity, the Fifth Circuit has held that, "[C]ertification is only appropriate where the class is so numerous that joinder of all members is impracticable," and that, while a plaintiff must demonstrate evidence or a reasonable estimate of purported class members, the Court has "repeatedly noted that the number of members in a proposed class is not determinative of whether joinder is impracticable." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2019) (citations omitted).

Instead, in the Fifth Circuit, "a number of facts other than the actual or estimated number of purported class members may be relevant to the numerosity question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Id*.

<u>Disparate Impact</u>

Here, the class includes 35 identified members. In its response provided in discovery, however, the Bureau indicated that it received 1,937 requests for religious accommodation. All indications are that the Bureau's policy regarding those who have requested religious accommodation was the same across the Bureau and that all or most of these individuals were

subject to the same policy wherever the Bureau operated. The number of FBI employees for whom the disparate treatment claims in this action would be applicable is between 35 and 1,937 employees.

## Failure to Accommodate: Testing

Of the 35 members of the original group of plaintiffs in this proceeding, six of the plaintiffs included claims based on religious objections to masking, distancing, and testing requirements, which amounts to 15% of the group. Based on that percentage, a fair assumption of the Bureau-wide number of those who requested a religious exemption to the masking, distancing, and testing requirements in addition to the vaccination mandate is 375. The Bureau indicated in its response to discovery that 31 FBI employees requested accommodations to the masking, testing, and / or social distancing protocols.

## Constructive Discharge

Similarly, of the 39 members of the original group of plaintiffs, three experienced constructive discharge, which is 7.7%, and amounts to an estimate of 192 individuals. In its response to discovery, the Bureau indicated that 253 FBI employees "resigned, retired, transferred to other agencies, or took mandatory retirement, disability retirement or early retirement after requesting a religious accommodation to the COVID-19 vaccine mandate."

Regarding each of the putative classes and subclasses contemplated here, the Fifth Circuit has stated that much smaller numbers of putative class members are enough to establish numerosity. *See e.g., Mullen v. Treasure Chest Casino*, 186 F.3d 620, 624 (5th Cir. 1999) (class size of 100 to 150 is "within the range that generally satisfies the numerosity requirement"). However, "the actual number of class members is not necessarily 'the determinative question, for

the proper focus under Rule 23(a)(1) is not on numbers alone, but on whether joinder is practicable in view of the numerosity of the class and all other relevant factors.'" *Navy Seals*, 594 F. Supp. 3d, at 778 (N.D. Tex. 2022) (*citing Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (internal quotations omitted).

Here, a class of up to 1937,[1] with subclasses of 31 and up to 253 members respectively, is well within the numbers found to satisfy the numerosity requirement according to the Fifth Circuit's jurisprudence.

### 2. Commonality

Commonality requires that "the resolution of common questions affect all or a substantial number of the class members." *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 2004 U.S. Dist. LEXIS 8158, *99 (5th Cir. Feb. 24, 2004). The Fifth Circuit, however, "police[s] the definition of class actions" carefully, to avoid the doors to class action lawsuits being "thrown open too wide." *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 935 (5th Cir. 2023).

Accordingly, it holds that "Commonality is satisfied only if the class members' claims depend upon a common contention such that the determination of its truth or falsity will resolve an issue . . . central to the validity of each one of the claims in one stroke." *Id.* (citation omitted). In other words, "a proposed class must prove that the claims of every class member depend upon a common contention . . . that is capable of class-wide resolution." *Perry*, 675 F.3d at 838 (*quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted). The inquiry asks whether the determination of the truth or falsity of common contention resolves an issue "central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. *See also, Braidwood Mgmt.*, 70 F.4th at 935.

---

[1] *Brown v. Mid-America Apts., LP*, 2018 U.S. Dist. LEXIS 127153, *8 (W.D. Tex. May 22, 2018) (holding putative class members, number in the thousands "cannot be practicably joined in a single action") (reversed on other grounds).

In *Navy Seals v. Austin*, Plaintiffs had brought similar questions of law and fact. *Navy Seals v. Austin*, 594 F. Supp. 3d 767, 778 (S.D. Tex. Mar. 28, 2022). There, Plaintiffs asserted common questions of fact and law under the Religious Freedom Restoration Act ("RFRA") and the Constitution. *Id*. The common questions that applied to all class members were: "whether the Navy inappropriately discriminated against religious beliefs in compelling vaccination despite those beliefs, refusing to accommodate those beliefs, and granting exemptions for secular but not religious beliefs." *Id*.

The court held those common questions sufficed to meet the commonality requirement of Rule 23. "The potential class members have suffered the 'same injury,' arising from violations of their constitutional rights. Each has submitted a religious accommodation request, and each has had his request denied, delayed or dismissed on appeal." *Id*. at 779. This Court also noted "Plaintiffs may experience diverse damages as a result of their beliefs, but they have suffered the same core injury. *Id*. (*citing In re Deepwater Horizon*, 739 F.3d, 810-11 (5th Cir. 2014) (commenting that, "Exactly zero requests have been granted. . .[and] it is hard to imagine a more consistent display of discrimination.")).

"The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001) (citations omitted).

<u>Disparate Impact</u>

Here, by the nature of the Disparate Impact cause of action, the resolution of one claim would result in the resolution all claims.

"Disparate impact claims deal with neutral employment practices that have a

proportionally adverse effect on the protected group. While discriminatory intent may be present, it need not be demonstrated by the plaintiff to succeed on a disparate impact theory." *Gordon v. Peters*, 489 F. Supp. 2d 729, 734 (S.D. Tex. Apr. 24, 2007)(citing *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006)). A disparate-impact plaintiff must show (1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class. *Id* at 735.

Disparate impact claims by their nature impact a group. Here it was a department-wide policy for religious believers who requested an accommodation to the vaccine mandate to experience an unscientific testing, masking, and distancing policy. The resolution of whether the facially neutral policy had a disproportionately adverse effect on a protected class on one or several of the 1,937 class members would resolve whether the policy had a disparate impact on religious believers Department-wide.

## Failure to Accommodate: Testing

The religious accommodation claim for testing involved a Department-wide policy of refusal to accommodate religious beliefs against testing. Similarly for that count, the resolution of whether the Bureau failed to accommodate one religious believer regarding testing would indicate whether the policy was unlawful across the FBI.

## Constructive Discharge

The resolution of whether one or a few employees were constructively discharged over FBI's COVID-19 vaccination, testing, masking, and distancing policies will have implications department-wide. Although the circumstances of constructive discharge in the normal course of workplace disputes could take many shapes, from the three plaintiffs who experienced it in this particular context it is clear that they followed a pattern: either the employees were placed on AWOL status for not testing and resigned before their termination (Geren, Seraphin), or they could not bear the uncertainty of waiting for a religious accommodation while under threat of

termination and resigned (Bezet). Class certification is appropriate for this subclass, as the same sets of issues apply both to the individuals named in this litigation and to a broader group of FBI employees who are members of a potential subclass.

3. **Typicality**

The Federal Rule 23(a) inquiry also requires a showing of typicality. Fifth Circuit case law on the question of typicality tends to treat the term according to its common meaning, with denials coming when the putative class agent will suffer from defenses that apply to him, but not the rest of the class. *See, e.g.*, *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984), *Garonzik v. Shearson Hayden Stone, Inc.*, 574 F.2d 1220, 1221 (5th Cir.1978), *cert. denied*, 439 U.S. 1072, 99 S. Ct. 844, 59 L. Ed. 2d 39 (1979).

"Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Mullen*, 186. F.3d at 625. The critical inquiry is whether the class representatives' claims have the "same essential characteristics" as those of the putative class and arise from a "similar course of conduct and share the same legal theory." *Navy Seals*, 594 F. Supp 3d at 780 (*citing James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001) (internal quotation marks omitted)). *See also*, *Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 301 (S.D.T.X. 2000).

Here, the principal class and the two subclasses all meet this requirement.

Regarding the class of disparate impact plaintiffs, the class representatives' claims will have identical characteristics as the putative class—the Bureau will have required them to test, mask, and distance after they filed a request for religious accommodation for which they received no response.

The subclass of individuals whose requests for religious accommodation over testing were

denied will also include class representatives whose experience shared the same essential characteristics as the putative class. There does not appear to have been any variation to the Bureau's policy of denying requests for religious accommodation for the testing, masking, and distancing requirements it imposed. To the extent that there is variation, this will tend to be variation in the consequences imposed for failure to test, which will speak to what damages the plaintiff experienced, which is an issue that is capable of an orderly determination as part of the litigation.

The subclass of individuals who experienced constructive discharge will also share essential characteristics with the class—they will tend to be those whom the Department placed on AWOL or those who experienced religious pressure and uncertainty as a result of their religious beliefs in light of the Department's mandates.

## Disparate Impact

Here, the putative class agents for the disparate impact claim suffered the same injury subject to the same defenses as any members of the putative class. As the disparate impact inquiry is one that by definition affects a group, a resolution by class is natural and appropriate in this case. Whether the Bureau-wide policy of masking, testing, and distancing for religious objectors disproportionately affected a protected group of religious believers is the central inquiry and would not be a disparate impact claim if the defenses available affected only part of the group.

## Failure to Accommodate: Testing

Regarding the failure of the Bureau to accommodate testing, all information available indicates that the Bureau's policy regarding denying religious accommodations for testing was a Bureau-wide policy. The factual patterns and related issues are therefore the same. It will come down to a simple inquiry of whether the employee requested a religious accommodation and did

not receive it. The only defenses available are that the employee was in fact accommodated or the accommodation would be an undue hardship.

Even if this constituted two separate groups (with perhaps a third where both defenses apply), this is a scenario that also lends itself to class adjudication according to additional subclasses. While the harms suffered may differ in some cases, the defenses available for the class agents' cases would be the same as those for the putative class.

<u>Constructive Discharge</u>

The named plaintiffs who suffered constructive discharge in this case included those who were either placed on AWOL status or those who left the Bureau over the stress, uncertainty, and harassment they experienced while waiting for a determination on their requests for religious discrimination. The class agents will have the same essential characteristics as the class, as there are no additional fact patterns that will tend to be applicable.

### 4. Adequacy of Representation

Rule 23(a) also speaks to the question of adequacy of representation. In the Fifth Circuit, the adequacy of representation analysis "encompasses two separate inquiries: (1) the willingness and ability of the named plaintiff to take an active role in and control the litigation and to protect the interests of absentees; and (2) the zeal and competence of the representative's counsel." *Guenther*, 2021 U.S. Dist. LEXIS at *21-22 (S.D.T.X. 2021) (citations omitted).

For the first inquiry, the question is whether "the class representatives must possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation," even though class representatives "need not be legal scholars, and are entitled to work with, and rely upon, their counsel in pursuing their claims and navigating the complicated legal and factual issues associated with complex litigation." A class representative is considered adequate when he has "familiarity with the complaint and with the concept of a class action." *Id.*

(citations omitted). Finally, the class representative must have no conflict of interest with the class and be willing to play an active role in the litigation. *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 552 (W.D. Tex. 2020).

The putative class agents—Mr. Villela and Mr. Seraphin—meet these requirements. They were at all relevant times FBI employees who requested a religious accommodation they never received and who experienced the discrimination that other class members or subclass members experienced. They experienced the same FBI policies, the same repercussions of these policies (forced testing, denial of work travel, inability to perform their jobs effectively, loss of development opportunities and pay and in some cases constructive discharge) and the same negative culture that other potential class members experienced. Both individuals have been involved in the litigation since the beginning and have accepted leadership roles in coordination and communication with the class members.

Accordingly, there is no reason for conflict among PCAs and putative class members and PCAs are in all ways adequate to represent the interests of the class contemplated here.

As for the competence and zeal of counsel representing the putative class, counsel has extensive experience with employment-related class action claims and complex litigation in multiple contexts. Lead Counsel for the Putative Class is a 2008 graduate of The Catholic University Columbus School of Law in Washington, DC and a member in good standing of the Virginia State Bar.

His first experience upon graduating law school was in drafting regulations related to civil rights in collaboration with the U.S. Department of Health and Human Service's Office of Civil Rights. He later worked in the Department's General Law Division, where, in addition to work on torts, medical malpractice, and contract disputes, he assisted in the litigation of Title VII employment actions.

His work since that time has focused on civil rights in both the public and private sector, at the local, state, federal, and international level, including protections under Title VII and complex legal matters involving multiple parties. This has included work in internal drafting and analysis for a major charitable and advocacy group, official comments for national regulatory efforts, written commentary, legislative drafting, and other related experience. Upon returning to the Government from 2017-2019, he also gained significant experience focusing on Agency-specific laws and regulations, including regulatory analysis and drafting, as a manager in the Senior Executive Service. There he provided substantive input on numerous legal initiatives, including class action litigation.

A major component of his independent law practice since opening in 2020 has been representation of individuals claiming discrimination under Title VII of the Civil Rights Act, its state analogue, or both. This has included litigation involving multiple plaintiffs / complainants and multiple class action complaints before the EEOC and in federal court that are among his current active cases.

Counsel for PCA has acted as counsel for more than a dozen EEO-related class cases, including cases at the administrative level and in federal court. Each of these cases implicates hundreds of employees.

Representation in this matter is adequate regarding the class agents and class counsel.

### ii. Rule 23(b)(3)

Federal Rule 23(b) requires plaintiffs to identify additional justifications for class certification. Here, class certification is appropriate according to Rule 23(b)(3).

Here, as indicated in Rule 23(b)(3), "questions of law or fact common to class members predominate over any questions affecting only individual members, and [] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Most of the Plaintiffs identified here have already proceeded together as a putative class through the administrative phase and through more than a year of federal litigation. Relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified.

The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed, they fall within definable categories that are easily manageable as indicated above.

A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within the Bureau.

## VI. **CONCLUSION**

For the forgoing reasons, Plaintiffs request this Court certify a class of FBI employees who experienced disparate impact discrimination arising out of the COVID-19 vaccine mandate, and subclasses of FBI employees who were refused religious accommodation for the testing, masking, and distancing protocols and those who experienced constructive discharge arising out of the mandate.

Dated: May 12, 2025

Respectfully Submitted:

E. Scott Lloyd
Lloyd Law Group, PLLC
106 Chester St, Suite 1
Front Royal, VA 22630
(540) 823-1110
scott@lloydlg.com
*Lead Counsel*
*Counsel for Plaintiffs*

*Admitted pro hac vice*

**Daniel W. Manning**
State Bar No. 24081018
Southern District State Bar No. 3098098
dmanning@bajb.com
*Local Counsel*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Defendants on May 12, 2025:

Myra Farah Siddiqui
DOJ-USAO
1000 Louisiana Street Suite 2300
Houston, TX 77002
713-567-9600
Email:Myra.Siddiqui@usdoj.Gov

Natasha Ann Alexander
DOJ-USAO
1000 Louisiana Street Ste #2300
Houston, TX 77002
713-567-9000
Email:Natasha.Alexander@usdoj.Gov

_____
E. Scott Lloyd