# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| Feds for Medical Freedom, et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:23-cv-01817 |
| | § | |
| Pam Bondi, et al.,[1] | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Dated: December 18, 2025

NICHOLAS J. GANJEI
United States Attorney

By: */s/ Myra Siddiqui*
Myra Siddiqui
Assistant United States Attorney
Southern District No. 3257790
Natasha Alexander
Assistant United States Attorney
Southern District No. 3770021
Texas Bar No. 24125476
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9000
Fax: (713) 718-3300
Email: myra.siddiqui@usdoj.gov
E-mail: natasha.alexander@usdoj.gov

Counsel for Defendants

---

[1] Pursuant to Fed. R. Civ. P. 25(d), a successor is automatically substituted as a party. Therefore, Defendant Attorney General Pamela Bondi is substituted for former Attorney General Merrick Garland.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ...................................................................................................... iv

   I.    NATURE AND STAGE OF THE PROCEEDING ............................................... 1

   II.   STATEMENT OF THE ISSUES ........................................................................ 2

   III.  SUMMARY OF THE ARGUMENT ................................................................... 2

   IV.  FACTUAL BACKGROUND ............................................................................. 3

   V.   STANDARD OF REVIEW ................................................................................ 8

   VI.  ARGUMENT .................................................................................................... 8

      A.   Class Certification Standard .......................................................................... 8

         1.   Rule 23(a)(1): Numerosity .................................................................. 9

         2.   Rule 23(a)(2): Commonality ............................................................ 10

         3.   Rule 23(a)(3): Typicality .................................................................. 10

         4.   Rule 23(a)(4): Adequacy ...................................................................11

         5.   Rule 23(b)(3): Predominance ............................................................11

         6.   Ascertainability ................................................................................ 12

      B.   Plaintiffs cannot certify a class based on a disparate impact claim. ............. 12

         1.   The proposed disparate impact class cannot satisfy commonality or typicality given the differences in Plaintiffs' accommodation requests, job titles, geographic locations, office-specific COVID protocols and enforcement, and alleged adverse employment actions. ............................................................. 13

         2.   The proposed disparate impact class fails the predominance requirement, because individual questions of law or fact will predominate over any common questions, and a class action is not a superior method for adjudicating this controversy. ........ 15

         3.   Plaintiffs have not shown that the proposed class representative satisfies the adequacy prerequisite ..................................................................... 18

      C.   Plaintiffs have not met their burden to show that certification of the subclass for the Failure to Accommodate claim is proper ....................................................... 20

         1.   Plaintiffs cannot satisfy numerosity with a proposed class of 31. ............................ 21

         2.   The proposed failure to accommodate class cannot satisfy commonality or typicality given the differences in religious beliefs, compliance with the challenged protocols, and burden of an accommodation for each unique job position. ............................. 21

         3.   Individual questions regarding religious beliefs, individual job positions, and adverse employment actions will predominate over any questions common to class

members, and a class action is not superior to other available methods to fairly and efficiently adjudicate this controversy. ................................................................. 24

D.   Plaintiffs cannot show that certification of the constructive discharge class is proper. 27

1.   Numerosity is not satisfied.................................................................................. 28

2.   Plaintiffs have not established commonality among the subclass, because the circumstances of each plaintiff's resignation is unique and individualized. ........... 30

3.   Nor can Plaintiffs demonstrate typicality. ........................................................... 33

4.   Plaintiffs have not established the adequacy of the class representative for the failure to accommodate or constructive discharge subclass.................................................. 33

5.   Plaintiffs have not satisfied the predominance requirement, because individual issues will predominated over class-wide issues.............................................................. 35

VII. CONCLUSION.................................................................................................... 36

CERTIFICATE OF SERVICE ................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Abrams v. Kelsey-Seybold Med. Grp., Inc.*,
    178 F.R.D. 116 (S.D. Tex. 1997) .................................................................. 10, 13, 14, 15

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ........................................................................... 8, 15, 16

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................................... 12

*Angell v. GEICO Advantage Ins. Co.*,
    67 F.4th 727 (5th Cir. 2023) ............................................................................... 11, 35

*Armstrong v. Powell*,
    230 F.R.D. 661 (W.D. Okla. 2005) .......................................................................... 30

*Aryain v. Wal-Mart Stores Tex., LF*,
    534 F.3d 473 (5th Cir. 2008) ......................................................................... 27, 30, 31

*Berger v. Compaq Comput. Corp.*,
    257 F.3d 475 (5th Cir. 2001) ............................................................................... 11, 19

*Brown v. Kinney Shoe Corp.*,
    237 F.3d 556 (5th Cir. 2001) .................................................................................... 27

*Chavez v. Plan Benefit Servs., Inc.*,
    957 F.3d 542 (5th Cir. 2020) ............................................................................... 10, 30

*Chavez v. San Francisco Bay Area Rapid Transit Dist.*,
    No. C 22-06119 WHA, 2024 WL 332881 (N.D. Cal. Jan. 28, 2024) ................. 25, 26

*Clausnitzer v. Fed. Express Corp.*,
    No. SA CV 05-1269 DOC (ANx), 2007 U.S. Dist. LEXIS 98466 (C.D. Cal. Oct. 19, 2007) . 29

*Coleman v. Dretke*,
    409 F.3d 665 (5th Cir. 2005) .................................................................................... 29

*Colindres v. QuitFlex Mfg.*,
    235 F.R.D. 347 (S.D. Tex. 2006) .................................................................. 8, 12, 17, 18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ....................................................................................... 12, 13, 15

*Crutchfield v. Sewerage & Water Bd. of New Orleans*,
    829 F.3d 370 (5th Cir. 2016) .................................................................................... 12

*De Bremaecker v. Short*,
    433 F.2d 733 (5th Cir. 1970) .................................................................................... 12

*Equal Emp. Opportunity Comm'n v. Bass Pro Outdoor World, L.L.C.*,
    826 F.3d 791 (5th Cir. 2016) .................................................................................... 13

*Equal Emp. Opportunity Comm'n v. U.S. Steel Tubular Prods., Inc.*,
    No. 4:14-CV-02747, 2016 WL 11795815 (S.D. Tex. Aug. 4, 2016) ........................ 20

*Feds for Med. Freedom v. Biden*,
    581 F. Supp. 3d 826 (S.D. Tex. Jan. 21, 2022) ......................................................... 7

*Flecha v. Medicredit, Inc.*,
    946 F.3d 762 (5th Cir. 2020) .................................................................................... 33

*Griffin v. GK Intelligent Sys.*,
   196 F.R.D. 298 (S.D. Tex. 2000) ...............................................................11, 19

*Groff v. DeJoy*,
   600 U.S. 447 (2023)....................................................................... 20, 23, 25

*Haley v. All. Compressor LLC*,
   391 F.3d 644 (5th Cir. 2004) ................................................................ 27, 33

*Ibe v. Jones*,
   836 F.3d 516 (5th Cir. 2016) ............................................................ 9, 21, 28

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ........................................................................ 30

*Izzio v. Century Golf Partners Mgmt., L.P.*,
   670 F. App'x 348 (5th Cir. 2016) ................................................................. 8, 9

*John v. Nat'l Sec. Fire & Cas. Co.*,
   501 F.3d 443 (5th Cir. 2007) ........................................................................ 12

*Jones City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) ........................................................................ 33

*Leal v. Paramount Rests. Grp., Inc.*,
   No. 2:12-CY-038-J, 2013 WL 1363616 (N.D. Tex. Apr. 4, 2013)...................... 9

*M.D. ex rel. Stukenberg v. Perry*,
   675 F.3d 832 (5th Cir. 2012) ............................................................ 9, 10, 30

*Madison v. Chalmette Ref., L.L.C.*,
   637 F.3d 551 (5th Cir. 2011) ........................................................................ 12

*McCoy v. City of Shreveport*,
   492 F.3d 551 (5th Cir. 2007)................................................... 27, 28, 31, 32

*Miller v. Grand Canyon Univ., Inc.*,
   540 F. Supp. 3d 625 (N.D. Tex. 2021) .......................................................... 10

*Mullen v. Treasure Chest Casino, L.L.C.*,
   186 F.3d 620 (5th Cir. 1999).......................................................................... 9

*Oden v. Oktibbeha Cnty., Miss.*,
   246 F.3d 458 (5th Cir. 2001) ........................................................................ 13

*O'Hailpin v. Hawaiian Airlines Inc.*,
   No. CV C22-00532 JAO-RT, 2023 WL 8600498 (D. Haw. Dec. 12, 2023)................ 21, 22, 25

*P.A. v. Phillips*,
   No. 21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023) ...................................... 29

*Rodriguez v. Flowers Foods, Inc.*,
   No. 4:16-CV-245, 2016 WL 7210943 (S.D. Tex. Dec. 13, 2016).............................. 12

*Sambrano v. United Airlines, Inc.*,
   347 F.R.D. 155 (N.D. Tex. 2024)................................................................... 26

*Simms v. Jones*,
   296 F.R.D. 485 (N.D. Tex. 2013).............................................................. 9, 21

*Speer v. UCOR LLC*,
   No. 3:22-CV-426, 2023 WL 7305037 (E.D. Tenn. Nov. 6, 2023) ........................ 25, 26

*Steering Comm. v. Exxon Mobil Corp.*,
   461 F.3d 598 (5th Cir. 2006) ........................................................................ 17

*Stephens v. C.I.T. Grp./Equipment Fin.*,
   955 F.2d 1021 (5th Cir. 1992)...................................................................... 30

*Stirman v. Exxon Corp.*,
   280 F.3d 554 (5th Cir. 2002) ................................................................. 10, 33
*Thompson v. Microsoft Corp.*,
   2 F.4th 460 (5th Cir. 2021) ........................................................................ 23
*Tyson Foods v. Bouaphakeo*,
   577 U.S. 422 (2016) .................................................................................... 36
*U.S. Navy SEALs 1-26 v. Austin*,
   594 F. Supp. 3d 767 (N.D. Tex. 2022) ....................................................... 24
*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ..................................................... 11, 18, 19, 35
*United States v. Herrera-Ochoa*,
   245 F.3d 495 (5th Cir. 2001) ...................................................................... 29
*W.H. Wall Family Holdings LLLP v. CeleNova Biosciences, Inc.*,
   No. 1:18-CV-303-LY, 2020 WL 1644003 (W.D. Tex. Apr. 2, 2020) ......... 35
*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................. passim
*Wilhoit v. AstraZeneca Pharms., LP*,
   No. CV 22-1634-GBW-SRF, 2024 WL 706901 (D. Del. Feb. 21, 2024) ... 25
*Young v. Southwestern Sav. & Loan Ass'n*,
   509 F.2d 140 (5th Cir. 1975) ...................................................................... 27
*Zideman v. J. Ray McDermott & Co.*,
   651 F.2d 1030 (5th Cir. 1981) ................................................................. 9, 28

**Statutes**

42 U.S.C. § 2000e–2(a)(1) .............................................................................. 20
42 U.S.C. § 2000e(j) ....................................................................................... 20

**Rules**

Fed. R. Civ. P. 23(a)(1) .................................................................................... 9
Fed. R. Civ. P. 23(a)(2) .................................................................................. 10
Fed. R. Civ. P. 23(b)(3) ............................................................................ 12, 25
Fed. R. Civ. P. 25(d) ......................................................................................... i
Federal Rule of Civil Procedure 33 ................................................................ 35

**Other Authorities**

Executive Order No. 14,099 .............................................................................. 8
Executive Order No. 14043 .................................................................. 3, 4, 7, 8

## I.    NATURE AND STAGE OF THE PROCEEDING

Plaintiffs, 34 current and former FBI employees and the organization Feds for Medical Freedom, filed this suit arising out of the FBI's COVID-related protocols on May 17, 2023, ECF No. 1, and amended their complaint on July 11, 2023, ECF No. 6. Defendants moved to dismiss on November 10 and 17, 2023. ECF Nos. 41 (individual capacity claims), 44 (official capacity claims). In response, Plaintiffs stipulated to dismissal of Feds for Medical Freedom as a Plaintiff and dismissal of all claims except for (1) the RFRA claim against the Individual Capacity Defendants and (2) the disparate impact, harassment/hostile work environment, retaliatory harassment, and constructive discharge Title VII claims against Defendant Garland in his official capacity. ECF No. 51 at 2. The Court ruled on April 29, 2024, dismissing all claims except the (1) disparate impact claim, (2) the failure to accommodate claim brought by Alexander Bayon, Kimberly Corpora, Rachelle Glenn, Bradley Johnson, Scott McGlothin, and Kyle Seraphin, and (3) the constructive discharge claim brought by Plaintiffs Malcom Bezet, Jennifer Geren, and Kyle Seraphin. ECF No. 59 at 21.

Four months later, Plaintiffs moved to certify one class and two subclasses on August 21, 2024—15 months after filing this lawsuit. ECF Nos. 64, 65. The Parties engaged in class certification discovery through April 21, 2025, including six depositions and the production of hundreds of pages. Plaintiffs filed an amended motion to certify class on May 12, 2024, ECF No. 80. On June 4, 2025, while class certification briefing was ongoing, Plaintiffs filed a motion for alternative dispute resolution, over the objection of Defendants. ECF No. 87. The Parties were ordered to mediate and were unable to reach a resolution at mediation before Judge Bray. ECF No. 99. Plaintiffs then filed a third motion for class certification on October 1, 2025. ECF No. 108.

## II.    STATEMENT OF THE ISSUES

1.      Whether Plaintiffs have met their burden to show that class certification is proper for their disparate impact claim.

2.      Whether Plaintiffs have met their burden to certify a subclass for their claim for failure to accommodate FBI employees who sought a religious accommodation from the COVID protocols such as masking, testing, and social distancing.

3.      Whether Plaintiffs have met their burden to certify a subclass for the constructive discharge claim.

## III.    SUMMARY OF THE ARGUMENT

Plaintiffs have not met their burden to establish that all prerequisites for class certification have been met. First, the proposed disparate impact class cannot satisfy commonality or typicality because of the different and individualized facts in Plaintiffs' accommodation requests, job titles, geographic locations, office-specific COVID protocols and enforcement, and alleged adverse employment actions. Moreover, the proposed disparate impact class cannot satisfy the predominance requirement, because individual questions of law or fact regarding injuries and other issues will predominate over any common questions, such that a class action is not a superior method for adjudicating this controversy.

Second, Plaintiffs have not shown that certification of the subclass for the failure to accommodate claim is proper. Plaintiffs cannot satisfy numerosity with a proposed class of 31. In addition, the proposed subclass cannot satisfy commonality or typicality given the differences in religious beliefs, individual compliance with the challenged protocols, and position-specific inquiry into the burden of an accommodation for each unique job position. Further, individual

questions regarding religious beliefs, individual job positions, and adverse employment actions will predominate over any questions common to class members.

Third, Plaintiffs cannot show that certification of the constructive discharge class is proper. Plaintiffs have not established commonality or typicality among the subclass, because the circumstances of each Plaintiff's resignation is unique and individualized.

Nor have Plaintiffs shown that the proposed class representative is willing to take an active role in and control the litigation and to protect the interests of absentees; indeed, both representatives have demonstrated little knowledge of and involvement in the class action. The proposed representatives thus do not satisfy the adequacy requirement. For these reasons, the Court should deny class certification.

## IV.    FACTUAL BACKGROUND

Plaintiffs challenge Executive Order 14043 ("EO"), 86 Fed. Reg. 50989 (Sept. 9, 2021), requiring covered federal employees to vaccinate against COVID-19, subject to exceptions required by law. ECF No. 6, ¶ 71. Following the direction of the EO, the Safer Federal Workforce Task Force ("Task Force") issued guidance on implementation of the vaccination requirement, which recognized that federal employees could be eligible for exceptions to the vaccination requirement based on a medical condition or sincerely held religious belief, and instructed each agency to "follow its ordinary process to review and consider what, if any, accommodation it must offer." *Id.*, ¶ 68; Task Force, Frequently Asked Questions, Vaccinations, https://perma.cc/VHQ3-R85R ("Vaccination FAQs").

At times relevant to this lawsuit, Plaintiffs held different positions in different geographic locations across the country. *E.g.*, Ex. 1, Geren Dep., 9:6-8, 10:1-2 (evidence technician in Phoenix Field Office); ECF No. 109 at 29, Brunstetter Decl., ¶ 1 (special agent in the Texas City Resident

Agency of the Houston Division); *id*. at 49, Corpora Decl., ¶ 10 (tactical specialist (formerly known as a staff operations specialist)); *id*. at 144, Sellers Decl., ¶ 2 (during March 2019 – December 2021, supervisory special agent bomb technician team leader in El Paso field office); *id*. at 103, McGlothin Decl. (engineering technician); Ex. 2, Cribbs Dep., 11:20-24, 24:4-13 (special agent in Harrisburg, PA).

On November 17, 2021, the FBI's Office of Equal Employment Opportunity Affairs circulated a memo to all FBI employees stating that it had received over 2,500 requests for accommodations, and that it was in the process of adjudicating them. ECF No. 6, ¶ 80. The memo announced that "[for] those who have completed the required COVID-19 vaccination attestations and requested a reasonable accommodation, no disciplinary action will be taken until an HR decision is rendered." *Id*., ¶ 81. Finally, the memo provided that employees seeking accommodations were required to adhere to COVID-19 "safety protocols," including masking, social distancing, and periodic testing. *Id*., ¶ 88. Some, but not all, Plaintiffs requested a second accommodation to be exempt from the masking-and-testing protocol. Only Plaintiffs who requested this second accommodation are bringing a claim for failure to accommodate.

Plaintiffs identify with various religions. ECF No. 109 at 81, Glenn Decl., ¶ 5 ("I am an Agnostic . . . ."); *id*. at 49, Corpora Decl., ¶ 13 (Christian and member of the Body of Christ); Ex. 3, Villela Dep., 65:4 ("I'm a Catholic Christian."). They allege various objections to the vaccine and sought religious accommodations from the mandate. *E.g.*, ECF No. 109 at 77, Geren Decl. ("I have a sincerely held belief that we are created in the image of God and our bodies are sacred and we must not interfere with our bodie's [*sic*] natural responses. The COVID-19 vaccine is not like all other vaccines in that it uses MRNA technology which interferes with our body's natural immune response."); Ex. 4, Bezet Dep., 73:10-13 ("My objection was not to the vaccine. It was to

the mandate of the vaccine in its universal application in society."); Ex. 3, Villela Dep., 62:8-14 (vaccine violates class representative's religious beliefs because "[t]he vaccines were developed using aborted fetus cells and I believe that abortion is a sin."). Some Plaintiffs also sought religious accommodations from the COVID protocols of masking, testing, and so on. *E.g.*, ECF No. 109 at 49, Corpora Decl., ¶ 13 (religious beliefs do not allow putting any mask, shield or covering on her face as she is made in the image of God or being assaulted by a foreign body being inserted into her nasal passages); Ex. 5, Glenn Dep., 53:13-54:5 (when asked why she requested an accommodation to masking requirement, responded "I felt that testing and the masking was a way to other people, a way to bully people, a way to single people out for ridicule and I don't believe it in that. My personal beliefs, my religious beliefs, I -- you don't treat people that way.").

The evidence thus far shows that all groups of unvaccinated FBI employees were treated the same[2], regardless of whether their reasons for not vaccinating were religious, medical, or otherwise. *See* Ex. 1, Geren Dep., 47:4-18 (testing policy was implemented on unvaccinated employees, including those who did not vaccinate for medical reasons); ECF No. 109 at 8, Andrews Decl., ¶ 28 (" I was forced to wear a medically ineffective mask when my vaccinated colleagues were not."); *id*. at 5, ¶ 18, ("The fact FBI required only the unvaccinated to test every 72 hours (and later, once per week) appeared to be retaliation for not complying with the mandate to get the vaccine."). For example, two of the named Plaintiffs submitted a request for *both* religious and medical accommodations (and received a response to neither). ECF No. 109 at 56, Cribbs Decl., ¶ 3 ("I submitted a request for both a religious Reasonable Accommodation (RA) and a medical RA in order to not be required to receive the vaccine. Those requests are still pending

---

[2] Whether task force officers were not required to vaccinate is immaterial, as, by Plaintiffs' own admission, task force officers are not FBI employees. *See* Ex. 2, Cribbs Dep., 64:17-24.

. . . .a"); *id*. at 112, Morrison Decl., ¶ 25 ("I submitted a medical and religious C19 shot exemption . . . and never heard if my exemptions were granted to this day."). Similarly, another named Plaintiff submitted both a religious accommodation request and a "legal request" under the Privacy Act. Ex. 4, Bezet Dep., 56:8-22, 133:2-3. Both requests received no response. *See* ECF No. 109 at 56, Cribbs Decl., ¶ 3; *id*. at 112, Morrison Decl., ¶ 25.

Plaintiffs contend that employees who did not share their religious beliefs "were not required to follow" these protocols yet admit that the protocols also applied to employees seeking medical—rather than religious—exemptions. Ex. 1, Geren Dep., 47:12-18 (FBI implemented testing policy on unvaccinated employees, including those who did not vaccinate for medical reasons); ECF No. 109 at 56, Cribbs Decl., ¶ 3 (request for religious accommodation and medical accommodation both remain pending); *id*. at 112, Morrison Decl., ¶ 25 (medical and religious exemption requests received no response); *see also* Ex. 4, Bezet Dep., 56:8-22, 133:2-3 (legal accommodation request under Privacy Act received no response).

As to the protocols and enforcement, Plaintiffs testified that the COVID-19 protocols themselves differed by office, depending on the transmission level in the area. Ex. 6, Parsons Dep., 82:16-83:7 (masking and testing policy varied based on local transmission levels); Ex. 2, Cribbs Dep., 82:5-83:10 (masking policy "would depend on the fluctuation in your local area"); Ex. 1, Geren Dep., 52:20-53:4 (testing policy "depended on the transmission level in our area"). In addition, enforcement of the COVID-19 protocols differed by office. Ex. 5, Glenn Dep., 77:8-12 ("some offices didn't enforce the testing policy in the same way that my office enforced it"); Ex. 1, Geren Dep., 37:24-38:2 (individuals who did not wear masks were not disciplined); Ex. 3, Villela Dep., 34:8-10, 35:19-21 (some offices were more lenient as to testing and masking as

others; "what El Paso did during the pandemic was not what other offices [did] during the pandemic").

Plaintiffs complied—or did not comply—with the COVID protocols in different ways. *See* Ex. 3, Villela Dep., 89:12-16 (took a total of eight COVID tests); Ex. 7, Elliott Interrog. Resp. No. 19 (took 20 COVID tests); ECF No. 109 at 48, Corpora Decl., ¶ 3 (refused to test); Ex. 4, Bezet Dep., 146:23-25 (complied with the testing policy "[a]s long as they required it"); Ex. 2, Cribbs Dep., 88:10-12 ("Q: Did you follow the testing policy for [] its entire duration? A: I did.").

Plaintiffs allege a myriad of outcomes from the COVID protocols, such as allegations of feeling "singled out and stigmatized," being placed on Absent Without Leave ("AWOL") status, or being denied work travel. ECF No. 109 at 57, Cribbs Decl. (felt "singled out and stigmatized"); *id*. at 77, Geren Decl.(placed on Absent Without Leave ("AWOL") status); Ex. 2, Cribbs Dep., 115:11-16 (never placed on AWOL or demoted); Ex. 1, Geren Dep. 49:7-9 (placed on leave without pay status for three months); *id*., 49:19-50:25 (moved to different position); Ex. 3, Villela Dep., 101:24-102:4 (never placed on leave without pay or AWOL); Ex. 4, Bezet Dep., 127:24-128:11 (█████████████████████████████████████████); Ex. 8, Arce Interrog. Resp. No. 13 (denied work travel due to unvaccinated status); Ex. 3, Villela Dep., 105:6-10 (never denied work travel during this time).

As of January 21, 2022, Plaintiffs are no longer subject to the vaccine mandate and safety protocols, which have been rescinded. On January 21, 2022, a nationwide preliminary injunction was entered prohibiting the government from "implementing or enforcing Executive Order 14043" pending resolution of the case on the merits. *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 836–37 (S.D. Tex. Jan. 21, 2022), *vacated and remanded*, 30 F.4th 503 (5th Cir. 2022), *vacated*, 37 F.4th 1093 (5th Cir. 2022) (en banc), *aff'd on reh'g*, 63 F.4th 366 (5th Cir. 2023) (en banc).

While that injunction remained in effect, no federal agency implemented the EO or disciplined any employee for noncompliance with its vaccination requirement. *See* Vaccination FAQs ("To ensure compliance with the applicable preliminary nationwide injunction . . . the Federal Government will take no action to implement or enforce the COVID-19 vaccination requirement pursuant to Executive Order 14043 . . . ."). The injunction was still in effect when, days before plaintiffs filed this lawsuit, President Biden revoked EO 14043. *See* Exec. Order No. 14,099, 88 Fed. Reg. 30,891 (May 9, 2023) ("EO 14099"). EO 14099 rescinded agency policies premised on EO 14043 and directed federal agencies to no longer implement or enforce it. *Id.* at 30,891.

## V.    STANDARD OF REVIEW

A district court's class certification decision is reviewed for abuse of discretion. *Izzio v. Century Golf Partners Mgmt., L.P.*, 670 F. App'x 348 (5th Cir. 2016).

## VI.    ARGUMENT

### A.  Class Certification Standard

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Rule 23 "does not set forth a mere pleading standard." *Id.* at 350. Instead, a party seeking class certification has the burden to "affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.*

A district court "maintains substantial discretion in determining whether to certify a class action." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998) (citation omitted). In reviewing a certification motion, a court "must examine the nature of the evidence that will be used to establish the claims and the defenses, to determine whether that evidence can be presented on a classwide basis." *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 369 (S.D. Tex. 2006) (citing

Fed. R. Civ. P. 23(c)(1) Committee Note (2003)). In determining whether a class should be certified, the Court should engage in a "rigorous analysis of the Rule 23 prerequisites before certifying a class." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012); *see also Izzio v. Century Golf Partners Mgmt., L.P.*, 670 F. App'x 348, (Mem)–350 (5th Cir. 2016) ("It is not enough that both sides may have stipulated to certification, because 'the court is bound to conduct its own thorough rule 23(a) inquiry.'"). The prerequisites of numerosity, commonality, typicality, and adequacy, predominance, and ascertainability are explained below.

### 1. Rule 23(a)(1): Numerosity

To satisfy numerosity, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is not solely focused on numbers, as the primary focus is "on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors." *See Zideman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir. 1981). The purpose of the numerosity requirement is "designed to prevent members of a small class from being unnecessarily deprived of their rights without a day in court." *Leal v. Paramount Rests. Grp., Inc.*, No. 2:12-CY-038-J, 2013 WL 1363616, at *3 (N.D. Tex. Apr. 4, 2013).

The Fifth Circuit has previously found that a size of class of "100 to 150 members—is within the range that generally satisfies the numerosity requirement." *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999), *abrogated in part on other grounds*, by *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). On the other hand, classes of less than 40 individuals are too small to satisfy numerosity. *See Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) (affirming denial of certification to putative class of 42, which was not so numerous that joinder of all members was impracticable); *Simms v. Jones*, 296 F.R.D. 485, 500 (N.D. Tex. 2013), *aff'd sub nom*. 836 F.3d 516 (5th Cir. 2016) (class of, at most, 40 did not satisfy numerosity).

### 2. Rule 23(a)(2): Commonality

Commonality requires there to be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement "demands more than the presentation of questions that are common to the class because any competently crafted class complaint literally raises common questions." *Stukenberg*, 675 F.3d at 840 (citing *Wal-Mart*, 564 U.S. at 349) (quotation omitted). After the Supreme Court's decision in *Wal-Mart Stores, Inc.*, "the commonality test is no longer met when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Id.* (quotation, citation and emphasis omitted).

Instead, "all of the class member's claims [must] depend on a common issue . . . whose resolution will resolve an issue that is central to the validity of each one of the class member's claims in one stroke." *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020). Under the typicality and commonality requirements, plaintiffs must "identify a class of people who have been subjected to the same or similar treatment as the class representatives and whose claims challenge the same employment practice." *Abrams v. Kelsey-Seybold Med. Grp., Inc.*, 178 F.R.D. 116, 128 (S.D. Tex. 1997).

### 3. Rule 23(a)(3): Typicality

To meet the typicality requirement under Rule 23(a)(3), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (citation omitted). The test of typicality asks, "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Miller v. Grand*

*Canyon Univ., Inc.*, 540 F. Supp. 3d 625, 634–35 (N.D. Tex. 2021). "[T]he commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 564 U.S. at 350 n.5.

### 4.  **Rule 23(a)(4): Adequacy**

The adequacy inquiry looks at whether the "class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members." *Unger v. Amedisys Inc.,* 401 F.3d 316, 321 (5th Cir. 2005). Here, courts look to "(1) the zeal and competence of the representative[s'] counsel; (2) the [willingness] and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 737 (5th Cir. 2023) (internal citations omitted).

As to the class representative, the representative is responsible for directing the litigation, and "must show themselves sufficiently informed about the litigation to manage the litigation effort." *Unger,* 401 F.3d at 321. A class representative will not meet the adequacy requirement "if he has so little knowledge of and involvement in the class action that [he] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000) (internal citations omitted).

Ultimately, it is Plaintiffs' burden to show that adequacy is met. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) (explaining how "[a]dequacy is for the plaintiffs to demonstrate; it is not up to defendants to disprove the presumption of adequacy.")

### 5.  **Rule 23(b)(3): Predominance**

To satisfy the 23(b)(3) predominance requirement, Plaintiffs must show that "(1) the questions of law or fact common to class members predominate over any questions affecting only

individual members, and that (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (citation omitted). When a plaintiff "seeks to certify a class under Rule 23(b)(3), the Rules demand a close look at the case before it is accepted as a class action." *Madison v. Chalmette Ref., L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). "The predominance inquiry . . . requires assessing all the issues in a case—including damages—and deciding whether the common ones will be more central than the individual ones." *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 378 (5th Cir. 2016).

### 6.  Ascertainability

In addition to the requirements in Rules 23(a) and 23(b), the Fifth Circuit separately requires plaintiffs to show that the class is "ascertainable." *See John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 n.3 (5th Cir. 2007) (quoting *De Bremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) for the proposition that "[i]t is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable."). To meet the ascertainability standard, plaintiffs are not required to identify every class member but "the general outlines of the membership of the class are determinable at the outset of the litigation." *Rodriguez v. Flowers Foods, Inc.*, No. 4:16-CV-245, 2016 WL 7210943, at *11 (S.D. Tex. Dec. 13, 2016).

### B.  Plaintiffs cannot certify a class based on a disparate impact claim.

To establish a disparate impact claim, Plaintiffs must show that there is "(1) a specific, facially-neutral employment practice, (2) that there is a statistically significant disparity among members of different groups affected by the practice, and (3) that there is a causal nexus between the facially-neutral employment practice and the statistically significant disparity." *Colindres*, 235

F.R.D. at 366. To recover compensatory or punitive[3] damages, "proof that an employment practice had a disparate impact is not enough"; instead, Plaintiffs "must prove that the employers *intended to discriminate* by engaging in a certain practice or act." *Equal Emp. Opportunity Comm'n v. Bass Pro Outdoor World, L.L.C.*, 826 F.3d 791, 796 (5th Cir. 2016) (citing 42 U.S.C. § 1981a(a)(1)) (emphasis added).

      **1.**   **The proposed disparate impact class cannot satisfy commonality or typicality given the differences in Plaintiffs' accommodation requests, job titles, geographic locations, office-specific COVID protocols and enforcement, and alleged adverse employment actions.**

Plaintiffs' claims will turn on individualized inquiries. For example, the element of disparate impact requiring a "causal nexus between the facially-neutral employment practice and the statistically significant disparity" will not be a common inquiry capable of classwide resolution. Given the variety of requests submitted to the Agency (whether religious, medical, legal) among the proposed class, the inquiry into the causal nexus between the challenged protocols and alleged disparity will necessarily be individualized among the class members.

Moreover, Plaintiffs do not share a common position, common office location, common supervisors, or common job duties; instead, they hold a variety of positions in offices across the country. *E.g.*, Ex. 1, Geren Dep., 9:6-8, 10:1-2 (evidence technician in Phoenix Field Office); ECF No. 109 at 29, Brunstetter Decl., ¶ 1 (special agent in the Texas City Resident Agency of the Houston Division); *id.* at 49, Corpora Decl., ¶ 10 (tactical specialist (formerly known as a Staff Operations Specialist)); *id.* at 144, Sellers Decl., ¶ 2 (during March 2019-December 2021, supervisory special agent bomb technician team leader in El Paso field office); *id.* at 103, McGlothin Decl. (engineering technician); Ex. 2, Cribbs Dep., 11:20-24, 24:4-13 (special agent in

---

[3] Title VII "precludes plaintiffs from recovering punitive damages against governments, government agencies, and political subdivisions." *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 465–66 (5th Cir. 2001) (citing 42 U.S.C. § 1981a(b)).

Harrisburg, PA). This difference among the Plaintiffs is material, because courts have found that "[t]ypicality and commonality are also lacking because the allegations and evidence show that the members of the purported class were not subjected to the same decision making authority." *Abrams*, 178 F.R.D. at 130 (citations omitted).

Indeed, the challenged employment practices varied across offices, as Plaintiffs testified that the COVID protocols themselves differed by office, depending on the transmission level in the area. Ex. 6, Parsons Dep., 82:16-83:7 (masking and testing policy varied based on local transmission levels); Ex. 2, Cribbs Dep., 82:5-83:10 (masking policy "would depend on the fluctuation in your local area") Ex. 1, Geren Dep., 52:20-53:4 (testing policy "depended on the transmission level in our area"). In addition, enforcement of the COVID protocols differed by office. Ex. 5, Glenn Dep., 77:10-12 ("some offices didn't enforce the testing policy in the same way that my office enforced it"); Ex. 1, Geren Dep., 37:24-38:2 (individuals who did not wear masks were not disciplined); Ex. 3, Villela Dep., 34:8-10, 35:19-21 (some offices were more lenient as to testing and masking than others). Thus, the alleged effect of the facially-neutral policy was different from office to office, such that an inquiry into the cause of each office's COVID protocols and enforcement of such protocols cannot be resolved on a classwide basis.

Further complicating the causation analysis and requiring individual inquiry, Plaintiffs complied—or did not comply —with the COVID protocols in different, individualized ways. *See* Ex. 3, Villela Dep., 89:12-16 (took a total of eight COVID tests); Ex. 7, Elliott Interrog. Resp. No. 19 (took 20 COVID tests); ECF No. 109 at 48, Corpora Decl., ¶ 3 (refused to test); Ex. 4, Bezet Dep., 146:23-25 (complied with the testing policy "[a]s long as they required it"); Ex. 2, Cribbs Dep., 88:10-12 ("Q: Did you follow the testing policy for [] its entire duration? A: I did.").

Similarly, per their allegations, Plaintiffs suffered different, individualized adverse employment actions. ECF No. 109 at 77, Geren Decl. (placed on AWOL status); Ex. 2, Cribbs Dep., 115:11-16 (never placed on AWOL or demoted); Ex. 1, Geren Dep. 49:7-9 (placed on leave without pay status for three months); *id.*, 49:19-50:16 (moved to different position); Ex. 3, Villela Dep., 101:24-102:4 (class representative never placed on leave without pay or AWOL); Ex. 4, Bezet Dep., 127:24-128:11 (█████████████████████████████████████████

████); Ex. 8, Arce Interrog. Resp. No. 13 (denied work travel due to unvaccinated status); Ex. 3, Villela Dep., 105:6-10 (class representative never denied work travel during this time). Because Plaintiffs did not experience similar treatment and are not challenging the same employment practice or injury, they lack commonality and typicality. *See Abrams*, 178 F.R.D. at 128 (under typicality and commonality requirements, plaintiffs must "identify a class of people who have been subjected to the same or similar treatment as the class representatives and whose claims challenge the same employment practice."). For this reason, certification should be denied.

### 2. The proposed disparate impact class fails the predominance requirement, because individual questions of law or fact will predominate over any common questions, and a class action is not a superior method for adjudicating this controversy.

In addition to lacking commonality or typicality, the predominance of individual-specific issues relating to Plaintiffs' claims means that a class action is not a superior method to resolve these claims. *See Comcast*, 569 U.S. at 34 (reversing certification of class under 23(b)(3), because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class"). For example, in *Allison*, the Fifth Circuit affirmed denial of class certification to Plaintiffs bringing disparate impact and other claims. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 407 (5th Cir. 1998). In that case, over 130 individuals filed suit on behalf of Black employees alleging racial discrimination in hiring, promotion, compensation, and training policies. *Id.* The

Court found that the class did not satisfy Rule 23(b)(3), concluding that plaintiffs' "claims for compensatory and punitive damages must . . . focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; what medical treatment did each plaintiff receive and at what expense; and so on and so on." *Id.* at 419. Under this type of analysis, "an action conducted nominally as a class action would 'degenerate in practice into multiple lawsuits separately tried.'" *Id.* (citation omitted). Thus, the Court denied certification, because the "predominance of individual-specific issues relating to the plaintiffs' claims for compensatory and punitive damages . . . detracts from the superiority of the class action device in resolving these claims." *Id.*

Here, similarly, Plaintiffs' claims will turn on individual inquiries into the level of compliance with the COVID protocols by each employee (which would inform causation); the kind of alleged discrimination each plaintiff was subjected to; how it affected each plaintiff emotionally; what consequences each plaintiff suffered; and so on. For example, some Plaintiffs complied with testing requirements in total, in part, or not at all. *E.g.*, ECF No. 109 at 48, Corpora Decl., ¶ 3 (refused to test); Ex. 3, Villela Dep., 89:12-16 (took a total of eight COVID tests); Ex. 7, Elliott Interrog. Resp. No. 19 (took 20 COVID tests); Ex. 4, Bezet Dep., 146:23-25 (complied with the testing policy "[a]s long as they required it").

In addition, the fact that Plaintiffs seek monetary damages and not across-the-board injunctive relief like *Navy Seals* means that the claim cannot be resolved by a common inquiry. Plaintiffs gave widely varied answers regarding damages sought. Ex. 3, Villela Dep., 106:10-14 ("Q: What damages . . .  are you seeking in this lawsuit? A: I'm not asking for any money.") (class representative); Ex. 7, Elliott Interrog. Resp. No. 19 (requesting damages of $100,000 each for 20

COVID tests taken, requesting $750,000 for "physical damages of difficulty breathing due to wearing a mask," requesting $8 million for "emotional damages due to the stress, anguish, harassment, embarrassment, and serious health problems"); Ex. 2, Cribbs Dep., 118:20-25 (requesting damages of $3 million in damages plus attorney fees).

These differences in injuries alleged by Plaintiffs weigh against certification. In *Steering Comm. v. Exxon Mobil Corp.*, the Fifth Circuit upheld a denial of class certification and a finding that the proposed class failed to satisfy the predominance requirement, reasoning that:

> Some plaintiffs allege both personal and property injuries, while others allege only one or the other. Moreover, many plaintiffs allege as part of their claim for compensatory damages emotional and other intangible injuries. The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards.

461 F.3d 598, 602 (5th Cir. 2006) (citation and quotations omitted); *see also* Ex. 3, Villela Dep., 110:17-111:6 (Class representative: "some of them were distressed in having to wear a mask. Some of them were very upset [to test] . . . And if those people think that they deserve some sort of monetary compensation because of their mental or psychological distress, so be it . . . . So, yeah, there will be a difference, obviously.").

Given the variance in injury and damages among the Plaintiffs, individual issues will predominate over classwide issues, such that Rule 23(b)(3) cannot be satisfied. *See Colindres*, 235 F.R.D. at 381 (because "recovery of punitive damages in Title VII cases requires individualized and independent proof of injury to, and the means by which discrimination was inflicted upon, each class member", "[t]hese are individual issues that will predominate over questions common to the class as a whole and defeats certification under Rule 23(b)(3)") (citation omitted).

### 3. Plaintiffs have not shown that the proposed class representative satisfies the adequacy prerequisite.

Plaintiff Jose Villela is not an adequate representative for the disparate impact class, as he has not shown his ability to direct the litigation, nor a willingness to protect the interests of absent plaintiffs. Mr. Villela lacks the requisite knowledge and involvement required to adequately represent the disparate impact class. First, Mr. Villela was wrong about which specific claims remain in this lawsuit. *E.g.*, Ex. 3, Villela Dep., 37:1-38:9 (believes RFRA and disparate treatment claims are being brought, despite voluntary dismissal; believes hostile work environment, retaliation claims are being brought, despite dismissal by the Court). He was unaware that four of the nine claims originally filed by Plaintiffs were *voluntarily* dismissed in whole or in part in Plaintiffs' response to Defendants' motion to dismiss.[4] *Id.*, 37:14-16; 38:1-23 (RFRA and disparate treatment claims). On the contrary, when asked about the RFRA and two constitutional claims which were voluntarily dismissed, Mr. Villela testified that he did not think that the claim was "voluntarily dismissed" and he understands the dismissal "was not his [attorney's] fault." *Id.*, 43:1-45:2 (regarding free exercise and due process claims, "I don't think any of these dismissals were voluntary."). Although he did produce documents, when asked why he never served responses to the document requests, he stated "I don't remember seeing this [request for production] document." *Id.*, 121:1-12. Mr. Villela therefore has not shown he is "sufficiently informed about the litigation to manage the litigation effort." *See Unger,* 401 F.3d at 321.

---

[4] *See* ECF No. 51 at 2 ("Plaintiffs have decided to withdraw the following claims and parties:(1) Remove Feds for Medical Freedom as Plaintiff (Counts I-IX); 2) Withdraw all Title VII claims against FBI Director Wray in his official capacity, FBI and DOJ (Counts I-IX); (3) Withdraw all Title VII Disparate Treatment claims (Count II); (4) Withdraw all constitutional claims (Counts VIII and IX); (5) Withdraw all RFRA claims against defendants in their official capacity (Count X)").

Moreover, instead of remaining informed and directing this lawsuit, Mr. Villela has been relying on his attorney to make decisions for the class. Despite Mr. Villela being in El Paso, Mr. Villela filed the lawsuit in Houston since "Scott [Lloyd, his attorney] has decided where it was going to be filed." Ex. 3, Villela Dep., 117:2-9. When asked whether he was aware that his attorney voluntarily dismissed multiple claims, such as the RFRA and disparate treatment claims, Mr. Villela stated that he trusts his attorney "fully with my eyes closed." *Id*., 38:1-23; 40:3-24 ("as to where I stand as far as my attorney goes, I trust him fully. . . . He's told me about the dismissal. When he started trying to go into detail, I said, 'Look, I trust you. Do what you have to do.'"). Mr. Villela plainly testified that he is not interested in the details of this case or remaining informed. *Id*., 41:3-6 ("I am aware that there was a dismissal. The specific points of which, I don't know and truly I don't care because I know that he's [attorney Scott Lloyd] handling it.")

As shown, Mr. Villela's incorrect understanding of what claims remain and how six of the nine claims were partly or entirely dismissed, his failure to participate in written discovery, and his "eyes closed" deferment to Mr. Lloyd make him an inadequate representative for this subclass. *See   Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000)(class representative inadequate if "he has so little knowledge of and involvement in the class action that [he] would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.") (internal citations omitted).

Further, there is a separate concern as to whether Mr. Villela can protect the interests of absent class members. Differences between the named class representative and class members can defeat a finding of adequacy of representation if the differences create conflicts. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 580 (5th Cir. 2001). When asked what monetary damages Mr. Villela is requesting from this lawsuit, he stated he was "not asking for any money." Ex. 3, Villela Dep.,

106:10-14. This is starkly different from other plaintiffs in this lawsuit. *See* Ex. 2, Cribbs Dep., 118:20-25 (requesting damages of $3 million in damages plus attorney fees); *see also* Ex. 7, Elliott Interrog. Resp. No. 19 (requesting damages of $100,000 each for 20 COVID tests taken, requesting $750,000 for "physical damages of difficulty breathing due to wearing a mask," requesting $8 million for "emotional damages due to the stress, anguish, harassment, embarrassment, and serious health problems"). Mr. Villela is thus not an adequate class representative.

For the foregoing reasons, certification of the disparate impact class should be denied.

### C. Plaintiffs have not met their burden to show that certification of the subclass for the Failure to Accommodate claim[5] is proper.

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e–2(a)(1). A failure to accommodate requires a showing that a plaintiff "(1) held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement." *Equal Emp. Opportunity Comm'n v. U.S. Steel Tubular Prods., Inc.*, No. 4:14-CV-02747, 2016 WL 11795815, at *11 (S.D. Tex. Aug. 4, 2016). An employer must "make reasonable accommodations for the religious observances of its employees, but is not required to incur "undue hardship on the conduct of the employer's business." *See* 42 U.S.C. § 2000e(j). "Undue hardship" is a "fact-specific inquiry" that is "shown when a burden is substantial in the overall context of an employer's business." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).

---

[5] Only Plaintiffs who sought an accommodation from the masking and testing requirements are bringing a claim for failure to accommodate. The failure to accommodate claim has been dismissed as to the 33 Plaintiffs who solely requested exemptions from the vaccine mandate. ECF No. 59 at 17.

**1. Plaintiffs cannot satisfy numerosity with a proposed class of 31.**

Thirty-one FBI employees requested a religious accommodation to the COVID testing, masking, and/or social distancing protocols. *See* Ex. 9, Defs.' Interrog. Resp. No. 2. This number is too low to satisfy numerosity and is thus insufficient to support certification. *See Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) (affirming denial of certification to putative class of 42, which was not so numerous that joinder of all members was impracticable); *Simms v. Jones*, 296 F.R.D. 485, 500 (N.D. Tex. 2013), *aff'd sub nom*. 836 F.3d 516 (5th Cir. 2016) (class of, at most, 40 did not satisfy numerosity). Because this subclass does not meet the numerosity prerequisite, certification should be denied.

**2. The proposed failure to accommodate class cannot satisfy commonality or typicality given the differences in religious beliefs, compliance with the challenged protocols, and burden of an accommodation for each unique job position.**

The proposed class does not satisfy commonality or typicality, as there are many questions of law or fact that will not be common to the class. For example, in declining to certify a class of individuals denied an accommodation to a vaccine mandate, the court in *O'Hailpin* noted that the first prong regarding a bona fide religious belief would not be a common inquiry. Specifically, "Plaintiffs' own arguments demonstrate that the Court could not answer the question of whether Hawaiian improperly denied these individuals' requests in one stroke. The evidence would not be the same for all class members and would instead still require the Court to look at the materials for each individual's accommodation request to see the precise basis for the objection to the vaccine and to what extent it was tied to a religious belief, and then compare treatment of that objection to Hawaiian's statements in this litigation (or treatment of other individuals' similar accommodation requests)." *O'Hailpin v. Hawaiian Airlines Inc.*, No. CV C22-00532 JAO-RT, 2023 WL 8600498, at *10 (D. Haw. Dec. 12, 2023). Nor was typicality satisfied, because:

> [C]hallenges to Covid-19 vaccine mandates bear out the concern that resolving the question of whether a sincerely held religious belief is in conflict with a vaccine policy may result in a "yes" answer for some employees, but a "no" answer for others, even when they have overlapping grounds for objecting to the vaccine. *See Ellison v. Inova Health Care Servs.*, 2023 WL 6038016, at *6–7 (E.D. Va. Sept. 14, 2023) (permitting one plaintiff's Title VII claim to proceed based on a claimed abortion-based objection to the Covid-19 vaccine, while dismissing another plaintiff's because her allegations were too conclusory to provide a sufficient connection between her objection to the vaccine and her subjective religious beliefs); *cf. Kather v. Asante Health Sys.*, 2023 WL 4865533, at *5 (D. Or. July 28, 2023) ("[V]ague expressions of sincerely held Christian beliefs alone cannot serve as a blanket excuse for avoiding all unwanted employment obligations. . . ."). In light of this, the Court also cannot say that the named Plaintiffs' claims will necessarily be typical.

*Id*.

Here, Plaintiffs have asserted their adherence to a variety of religious beliefs and sects. ECF No. 109 at 81, Glenn Decl., ¶ 5 ("I am an Agnostic . . . ."); *id*. at 49, Corpora Decl., ¶ 13 (Christian and member of the Body of Christ). More importantly, Plaintiffs' specific religious objections to the COVID protocols differ. *E.g.*, ECF No. 109 at 49, Corpora Decl., ¶ 13 (religious beliefs do not allow putting any mask, shield or covering on her face as she is made in the image of God or being assaulted by a foreign body being inserted into her nasal passages); Ex. 5, Glenn Dep., 53:13-54:5 (when asked why she requested an accommodation to masking requirement, responded "I felt that testing and the masking was a way to other people, a way to bully people, a way to single people out for ridicule and I don't believe it in that. My personal beliefs, my religious beliefs, I -- you don't treat people that way."). Given the diversity in beliefs that purported conflict with the COVID protocols, the Court would need to examine "the materials for each individual's accommodation request to see the precise basis for the objection to the vaccine and to what extent it was tied to a religious belief." *O'Hailpin*, 2023 WL 8600498 at *10.

In addition, the element regarding whether Plaintiffs suffered an adverse employment action "for failing to comply with the conflicting employment requirement" will also require the

Court to engage in individualized inquiry. As demonstrated in the depositions, some Plaintiffs complied with the COVID protocols, while others did not. ECF No. 109 at 48, Corpora Decl., ¶ 3 (refused to test); *id.* at 83, Glenn Decl., ¶ 11 (tested multiple times to avoid AWOL); *id.* at 103-104, McGlothin Decl., ¶¶ 2, 5 (went on AWOL status for refusing to test). To determine causation, the Court would thus need to examine whether each individual Plaintiff failed to comply with the COVID protocols and the extent of each Plaintiff's non-compliance.

In addition, whether any religious accommodation would cause an "undue hardship" to the FBI's operations is also an individualized inquiry given the range of positions held by Plaintiffs. *See Groff*, 600 U.S. at 470 ("an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its *particular* business") (emphasis added); *E.g.*, ECF No. 109 at 80, Glenn Decl., ¶ 1 (Special Agent in Charlotte, NC); *id.* at 49, Corpora Decl., ¶ 10 (tactical specialist (formerly known as a staff operations specialist)); *id.* at 99, Johnson Decl., ¶ 1 (supervisory special agent); *id.* at 103, McGlothin Decl. (engineering technician). The "undue hardship" inquiry regarding whether a particular religious accommodation would constitute a substantial increased cost to the FBI's operations would examine, for example, whether each plaintiff worked with physical records that could not be taken outside an FBI building, whether their work involved classified information that could only be viewed at the office, whether they worked in person with other team members, and the individual needs of their office and their team. *See Thompson v. Microsoft Corp.*, 2 F.4th 460, 468 (5th Cir. 2021) (affirming dismissal of failure to accommodate claim where requested accommodations would make employee unable to perform essential functions of his role).

This case is distinguishable from *Navy Seals* cited by Plaintiffs, which involved RFRA and First Amendment claims, which have different elements and have been voluntarily dismissed in

this case. The *Navy Seals* plaintiffs presented independent evidence of the sincerity of class members' beliefs, because "everyone eligible for the class has submitted a religious accommodation request, and no one may submit that request without a chaplain's memorandum attesting to the applicant's sincerity." *See U.S. Navy SEALs 1-26 v. Austin*, 594 F. Supp. 3d 767, 780 (N.D. Tex. 2022). Plaintiffs have not provided such evidence here, so the sincerity of their religious beliefs has not yet been proven. In addition, the *Navy Seals* plaintiffs sought certification under Rule 23(b)(2), which was appropriate since "potential class members may receive relief from a single injunction." *Id*. at 783. Here, Plaintiffs do not seek uniform relief, making certification inappropriate. *Id*. at 779 ("The bottom-line question under commonality and typicality is whether the relief the named plaintiffs seek from the Court will resolve all class members' legal claims."). On the contrary, Plaintiffs seek certification under Rule 23(b)(3), a standard which was not analyzed in *Navy Seals* and which cannot be met as individual questions will predominate over classwide issues, as explained below.

Because the failure to accommodate claim must be resolved by individual questions, class certification is not appropriate for this claim.

> **3.   Individual questions regarding religious beliefs, individual job positions, and adverse employment actions will predominate over any questions common to class members, and a class action is not superior to other available methods to fairly and efficiently adjudicate this controversy.**

Courts have regularly held that the existence of various religious beliefs precludes a finding that predominance is satisfied for class certification purposes. For example, the court in *O'Hailpin* concluded that "individualized inquiries into whether [plaintiffs] had a religious belief that conflicted with a vaccine requirement would predominate any common inquiry into whether [the employer] was antagonistic to granting religious accommodations to unvaccinated employees— and so the Court concludes certification of that class of individuals cannot meet the requirements

of a Rule 23(b)(3) damages class." *See O'Hailpin*, 2023 WL 8600498 at *10. "Plaintiffs submitted nearly as many systems of belief and grounds for objection as they did applications. Whether or not any one request rests on a bona fide religious belief presents an individual inquiry. . . ." *Chavez v. San Francisco Bay Area Rapid Transit Dist.*, No. C 22-06119 WHA, 2024 WL 332881, at *4 (N.D. Cal. Jan. 28, 2024); *see also Speer v. UCOR LLC*, No. 3:22-CV-426, 2023 WL 7305037, at *9 (E.D. Tenn. Nov. 6, 2023) (in case where all named plaintiffs were Christian, "[e]ven if all class members did hold the same beliefs, a factfinder still would have to determine the sincerity of each person's beliefs," such that "[t]he issues of religious belief and sincerity would predominate over any shared questions of law and fact"); *Wilhoit v. AstraZeneca Pharms., LP*, No. CV 22-1634-GBW-SRF, 2024 WL 706901, at *7 (D. Del. Feb. 21, 2024), report and recommendation adopted, No. CV 22-1634-GBW-SRF, 2024 WL 2843169 (D. Del. Jun. 5, 2024) (denying certification of class challenging vaccine mandate as "[e]ven among Plaintiffs who raise the same religious objection, an analysis of whether each Plaintiff's objection is truly rooted in religion and/or whether the belief is sincerely held will require an individualized assessment. . . . Plaintiffs' claims are not suitable for class resolution because the common questions of law and fact do not apply to all class members and are not 'amenable to class-wide proof.'").

In addition, the variety of positions and job duties held by Plaintiffs weighs against certification, as an individualized examination into the costs of accommodation will predominate over any common questions. The undue hardship inquiry requires consideration of "the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer," which is necessarily a different analysis for different jobs. *See Groff*, 600 U.S. at 470–71 (quotation omitted); *see also Chavez*, 2024 WL 332881, at *5 ("[T]he purported class's job diversity again means that the degree of hardship cannot be understood without an

interrogation of individual employees' job duties."); *Speer*, 2023 WL 7305037, at *9 (concluding that "[i]ndividualized determinations would inevitably predominate over any shared questions of law or fact" because "[w]hat it means for an accommodation to be 'reasonable' and for a hardship to be 'undue,' is an inherently individualized analysis which depends on the duties and responsibilities of each employee."). Therefore, "[t]he vocational diversity of plaintiffs' proposed class breaks common issues into a variety of individual factual inquiries, defeating predominance." *Chavez*, 2024 WL 332881, at *5 (citation omitted).

The variety of injuries among Plaintiffs is similarly fatal to predominance. In *Sambrano*, the Court found that the practical difficulties of managing the proposed classes would "undermine the judicial efficiency of class-wide resolution." *Sambrano v. United Airlines, Inc.*, 347 F.R.D. 155, 185 (N.D. Tex. 2024). "[A] 23(b)(3) class consisting of employees who were required to mask and test, each of whom suffered different harms and adverse employment actions—harassment, difficulty breathing, lonely lunches, excessive Lysol spraying—would be unmanageable and inefficient." *Id*. Therefore, "[t]he class members could not make out a prima facie case of religious discrimination without individualized inquiry." *Id*.

Here, Plaintiffs allege different harms and adverse employment actions, such as being marked AWOL, being denied the opportunity to be a training instructor or travel for work, or experiencing anxiety. *See* Ex. 5, Glenn Dep., 99:1-18 (not denied any opportunities for work travel); ECF No. 109 at 100, Johnson Decl., ¶ 7 (denied ability to be an instructor in training and denied work travel); *id*. at 48, Corpora Decl., ¶ 7 (marked AWOL); Ex. 5, Glenn Dep., 91:1-13 (experienced anxiety and panic attacks). In light of these different harms and employment actions, individual questions will predominate over any questions common to class members,

such that a class action is not superior to other available methods to fairly and efficiently adjudicate the failure to accommodate claim, precluding certification under Rule 23(b)(3).

**D. Plaintiffs cannot show that certification of the constructive discharge class is proper.**

Plaintiffs request certification of a subclass for "plaintiffs who experienced constructive discharge after requesting a religious accommodation for vaccination and/ or testing/ masking." *See* ECF No. 108 at 5.

"Constructive discharge occurs when an employee has quit her job under circumstances that are treated as an involuntary termination of employment." *Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004) (quoting *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). This fact-intensive inquiry requires a court to determine "whether working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Aryain v. Wal-Mart Stores Tex. LF*, 534 F.3d 473, 480 (5th Cir. 2008) (citations omitted). Further, "[d]iscrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

To determine whether an employer's actions constitute constructive discharge, courts in the Fifth Circuit look to factors such as "(1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Even when an employee's job responsibilities change or the employee is transferred, the Court is not compelled to find constructive discharge. *See Aryain*, 534 F.3d at 481 ("[P]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.")

27

(emphasis in original). The ultimate question to ask in assessing a constructive discharge claim is "whether a reasonable person in the plaintiff's shoes would have felt compelled to resign." *See McCoy*, 492 F.3d at 557.

### 1. Numerosity is not satisfied.

Plaintiffs have not met their burden to establish that numerosity is met. Plaintiffs rely on an estimated figure based on an extrapolation of an estimated percentage; however, they provide no additional information to support a finding of numerosity.

Plaintiffs attempting to establish numerosity "must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *See Ibe*, 836 F.3d at 528 (cleaned up). Relevant questions for numerosity include "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *See id.* (quoting *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir. 1981)).

Plaintiffs cannot show that they meet the numerosity burden. Plaintiffs attempt to use the percentage of individuals in their self-selected group to extrapolate a percentage that can be applied to all FBI employees. Here, Plaintiffs have come up with an estimate of "192 individuals" who were allegedly constructively discharged due to requirements related to COVID-19. ECF No. 108 at 7. There is no explanation of how the named Plaintiffs were chosen or any evidence to suggest they are somehow representative of FBI employees across the country such that their rate of individuals bringing a constructive discharge claim should be extrapolated nationwide.

Plaintiffs further note that the FBI has indicated that there are "253 FBI employees [that have] 'resigned, retired, transferred to other agencies, or took mandatory retirement, disability retirement or early retirement after requesting a religious accommodation to the COVID-19 vaccine mandate.'" *Id.*  However, this 253 number is overinclusive, as it includes *all* individuals

who have resigned, retired, or transferred for *any* reason after requesting a religious accommodation to the COVID-19 vaccine. Plaintiffs have presented no evidence regarding how many of the 253 faced the FBI's mandatory retirement age. *See Special Agent FAQ: Frequently Asked Questions and Answers,* https://fbijobs.gov/sites/default/files/2023-03/Special_Agent_FAQ.pdf (last visited December 16, 2025).[6] Nor is there any evidence as to how many of the 253 FBI employees transferred to other agencies or resigned for personal or professional benefit. Plaintiffs ignore in their estimate the fact that people leave jobs for all sorts of reasons such as pay, location, or a general desire to pursue a new role. *See Clausnitzer v. Fed. Express Corp.*, No. SA CV 05-1269 DOC (ANx), 2007 U.S. Dist. LEXIS 98466, at *27 (C.D. Cal. Oct. 19, 2007) (denying class certification in part because Plaintiffs had not provided evidence that terminations from the employer could not be attributed to "individualized factors rather than single corporate policy.") And they have presented no evidence regarding the reasons why any individuals other than the three named plaintiffs transferred or left.[7] Furthermore, Plaintiffs provide no information on the geographical dispersion of the class, the ease with which these class members could be identified, and the size of each plaintiff's claim.

Plaintiffs thus have not met their burden to show that numerosity is met for the proposed constructive discharge subclass.

---

[6] The Court can take judicial notice of "any fact not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonable questioned." *United States v. Herrera-Ochoa,* 245 F.3d 495, 501 (5th Cir. 2001); *see also Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir. 2005) (taking judicial notice of government website).

[7] Nor is this class of individuals who were either placed on AWOL or resigned based on feelings of "stress, uncertainty and harassment" readily ascertainable. *See* ECF No. 108 at 13. "To be ascertainable, the class must be susceptible to a precise definition to properly identify 'those entitled to relief, those bound by the judgment, and those entitled to notice.' . . . . 'The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) . . .'" *A. A. by & through P.A. v. Phillips*, No. 21-30580, 2023 WL 334010, at *2 (5th Cir. Jan. 20, 2023).

**2. Plaintiffs have not established commonality among the subclass, because the circumstances of each plaintiff's resignation is unique and individualized.**

Although, each of the three named plaintiffs resigned from the FBI, each plaintiff left under different circumstances. Constructive discharge requires a fact-intensive inquiry into whether the conditions were so "intolerable" that a reasonable person would have resigned in the same position. *Aryain*, 534 F.3d at 480 (citations omitted). These differing circumstances and this fact intensive inquiry will make it almost impossible to "resolve an issue that is central to the validity of each one of the class member's claims in one stroke." *See Chavez*, 957 F.3d at 547.

To satisfy commonality, the plaintiffs must "demonstrate the class members 'have suffered the *same injury*.'" *Stukenberg*, 675 F.3d at 840 (emphasis added). It is not sufficient to state that they have "suffered a violation of the same provision of law." *Wal-Mart*, 564 U.S. at 350. Instead, Plaintiffs must demonstrate that the class members suffered from the same "injurious conduct" by Defendants. *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014).

The nature of a constructive discharge claim does not lend itself to a finding of commonality. *See Stukenberg*, 675 F.3d at 842 (explaining how a district court's commonality analysis was flawed since "the district court conducted no analysis of the elements and defenses for establishing any of the proposed class claims."); *see also Armstrong v. Powell*, 230 F.R.D. 661, 679 (W.D. Okla. 2005) (finding that typicality and commonality were not met for certification of a constructive discharge class because of "the sheer number and diversity of environments involved."). For example, the Fifth Circuit held that an employee suffered from constructive discharge when the employee was demoted, suffered a pay cut, and his supervisor repeatedly asked the employee when he was going to quit. *Stephens v. C.I.T. Grp./Equipment Fin.,* 955 F.2d 1021, 1027 (5th Cir. 1992). However, constructive discharge was not found in a separate case when an

employee was transferred to a different department and resigned 20 days later. *See Aryain*, 534 F.3d at 482.

Whether an individual was constructively discharged is a fact-specific inquiry that must ultimately be determined based on the facts of each individual case. *See McCoy*, 492 F.3d at 557 (constructive discharge cases look at, for example, reduction in salary, reduction in job responsibilities, reassignment to menial work, etc.). Based on the Motion for Class Certification, Plaintiffs have not shown that they satisfy the commonality requirement.

Despite the fact intensive nature of constructive discharge claims, Plaintiffs argue that commonality is met for this subclass because plaintiffs faced the same pattern of either "the employees were placed on AWOL status for not testing and resigned before their termination (Geren, Seraphin), or they could not bear the uncertainty of waiting for a religious accommodation while under threat of termination and resigned (Bezet)." *See* ECF No. 108 at 10-11. Even from these examples, whether objective facts show an employee was placed on AWOL is a different inquiry than establishing that an individual's working environment was so intolerable that a reasonable person would choose to resign.

Even between the three named Plaintiffs, their alleged claims of constructive discharge are different. Although each individual left the FBI, they left under very different circumstances. In this proposed subclass, Malcom Bezet, Jennifer Geren, and Kyle Seraphin are the named plaintiffs for constructive discharge. *See* ECF No. 108 at 4.

Mr. Bezet, a former Special Agent, was not demoted, placed on unpaid leave, denied a promotion, transferred to another office, or denied work travel as a result of the COVID protocols implemented by the FBI. Ex. 4, Bezet Dep., 159:17-160:11, 161:6-162:9. Rather, Mr. Bezet retired from the FBI in the same position that he held throughout the COVID pandemic. *Id.*,18:2-24.

████████████████████████████████. *Id.*, 144:17-23. After he left the FBI, he and

his wife manage investment properties. *Id.*, 187:24-188:22.

    As for Ms. Geren, she was placed on leave without pay from December 2021 to March

2022. Ex. 1, Geren Dep., 49:7-9. Ms. Geren was placed in that status for refusing to test, *id.*, 43:9-

23, despite having no religious objection to the testing policy itself. *Id.*, 47:23-25. After returning

to a duty status, Ms. Geren was transferred to a new position, unlike Mr. Bezet, in the same office

with the same pay. *Id.*, 49:14-51:2. Within two months of returning to the FBI, Ms. Geren elected

to take paid parental leave and resigned the day before she was set to return. *Id.* 51:19-22, 53:21-

54:6. Also of relevance, u██████████████████████████████████████████████

████████████████, Ms. Geren was never subject ███████████████████████████. *See*

*id.*, 24:24-25:3. After leaving the FBI, Ms. Geren has not found another job, because she "decided

to stay home" with her children. *See id.*, 56:8-11.

    Both Ms. Geren and Mr. Bezet's situations leading up to their resignation are unique from

each other and different than the proposed lead plaintiff of this subclass, Kyle Seraphine. Mr.

Seraphine, unlike Mr. Bezet or Ms. Geren, ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████. *See* ECF No. 109 at ¶72-73; 78.

    Given the different circumstances that lead to each of the three named Plaintiffs'

resignation, determining "whether a reasonable person in the plaintiff's shoes would have felt

compelled to resign" will be an individualized inquiry that is central to the validity of each

plaintiff's claim. *See McCoy*, 492 F.3d at 557. Adding even more individuals to the class will more

likely than not add more unique fact patterns that would need to be examined on an individualized

basis. Commonality is therefore not met, and this subclass should not be certified.

### 3.  Nor can Plaintiffs demonstrate typicality.

The typicality requirement questions "whether the class representative's claims have the same essential characteristics of those of the putative class." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (quoting *Jones City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)). Given the similarity in the analysis of commonality and typicality, a failure to prove commonality is also a failure to show typicality or predominance, since "if there is no common issue uniting the putative class[,]" then plaintiff's claim cannot be "typical of the claims or defenses of the claim." *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 768 (5th Cir. 2020)

As explained above, the named plaintiffs do not have the same injury or same circumstances informing their decisions to resign from the FBI; thus, their claims do not share the same essential characteristics. Plaintiffs allege the subclass will constitute plaintiffs "who were either placed on AWOL status or those who left the Bureau over the stress, uncertainty, and harassment they experienced while waiting for a determination on their requests for religious [accommodation] discrimination." *See* ECF No. 108 at 13. Even Plaintiffs' proposed fact patterns do not show that there is a "common issue" that will unite the putative class.

Further, the nature of a constructive discharge claim is a "case-and fact-specific[,]" thus for a constructive discharge claim to be common is highly unlikely.  *See Haley*, 391 F.3d at 649.

### 4.  Plaintiffs have not established the adequacy of the class representative for the failure to accommodate or constructive discharge subclass.

As to adequacy, Mr. Seraphin has not provided evidence demonstrating that he is an adequate representative, nor has he shown a willingness to "direct" the litigation.[8]

---

[8] For the same reasons Mr. Seraphin cannot show he is an adequate representative of the constructive discharge subclass, he has not demonstrated that he is an adequate representative of the failure to accommodate claim.

When Plaintiffs first filed their Motion to Certify Class in May 2025, ECF No. 80, Mr. Seraphin simply provided an outdated declaration to support his capacity to serve as class representative. *See* ECF No. 80-1 at 118-136. This declaration was dated one year prior to the filing of the lawsuit. ECF No. 80-1. Regardless, his new declaration further magnifies how different Mr. Seraphin's claim of constructive discharge is from the other named subclass plaintiffs. In his new declaration, Mr. Seraphin provides information ███████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████. *See id*. 109 at 72-73 (alteration in original). █████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████. *See id.* at 78. Although Mr. Seraphin attempts to claim that ███████████████ ████████████████ for his failure to participate in the COVID-19 protocols, *id*. at 121, he also attests that another squad mate who filed a similar accommodation request was not placed on AWOL or suspended. *Id*. at 122.

Mr. Seraphin's declaration thus highlights individualized fact issues regarding whether his ███████████████████████ was a byproduct of his refusal to participate in the COVID protocols or due to his own individual actions while at the FBI. As a result, Mr. Seraphin's markedly different circumstances will require different discovery, factual investigation, and arguments than other subclass members. For example, Ms. Geren and Mr. Bezet ████████████████████████████ while employed at the FBI. In addition, Mr. Seraphin was placed on indefinite leave ██████████ █████████████████████████████, unlike Ms. Geren or Mr. Bezet, who eventually resigned from the FBI in good standing. Given these differences in factual circumstances, Defendants will likely have different defenses as to the actions taken against Mr. Seraphin while employed at the FBI as opposed to Ms. Geren or Mr. Bezet.

Next, Mr. Seraphin has not demonstrated a "[willingness] and ability . . . to take an active role in and control the litigation and to protect the interests of absentees." *See Angell*, 67 F.4th at 737. In the over two and a half years since this lawsuit was filed, Mr. Seraphin's only active participation in this lawsuit seems to be attending a mediation. Although Mr. Seraphin provided interrogatory responses, he never signed or verified his responses as required under Federal Rule of Civil Procedure 33. *See W.H. Wall Family Holdings LLLP v. CeleNova Biosciences, Inc.*, No. 1:18-CV-303-LY, 2020 WL 1644003, at *10 (W.D. Tex. Apr. 2, 2020) (explaining that each interrogatory must be "answered separately and fully in writing under oath."). There is no other indication he has been active or has taken steps to protect the interests of absent class members.

Lastly, there is no evidence to show that Mr. Seraphin has been "directing" this lawsuit. *See Wal-Mart*, 564 U.S. at 348 (a party seeking class certification has the burden to "affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."*).* Nor has he presented evidence that he is "sufficiently informed about the litigation to manage the litigation effort." *See Unger,* 401 F.3d at 321.

Mr. Seraphin's failure to provide affirmative evidence of his adequacy as class representative coupled with individualized facts central to his constructive discharge claim render him an inadequate class representative.

### 5. Plaintiffs have not satisfied the predominance requirement, because individual issues will predominated over class-wide issues.

Plaintiffs fail the predominance requirement in a similar fashion as they fail the commonality and typicality requirements. Plaintiffs' individual claims will predominant over common claims the class would share. Individual questions are "one where members of a proposed class will need to present evidence that varies from member to member, while a common question

is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods v. Bouaphakeo*, 577 U.S. 422, 453 (2016) (citations omitted).

As explained prior, whether a constructive discharge has taken place is case-specific and fact-intensive, such that the inquiry into the circumstances leading up to resignation would not be common to the class. Whether any one of the subclass members have suffered constructive discharge will require an analysis of evidence provided by each individual plaintiff. Each individual claim of constructive discharge will also have different evidence and witnesses, as each plaintiff worked in a different office, had different job responsibilities, different supervisors, and resigned under different circumstances. Given the fact that individual questions will predominate over class wide questions, Plaintiffs have failed to show that a class action is superior to other available methods for fairly and efficiently adjudicating the constructive discharge claim. Accordingly, certification of this class should be denied.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

Respectfully Submitted,

Dated: December 18, 2025                NICHOLAS J. GANJEI
                                        United States Attorney

                                        By: */s/ Myra Siddiqui*
                                        Myra Siddiqui
                                        Assistant United States Attorney
                                        Southern District No. 3257790
                                        Texas Bar No. 24106434
                                        Natasha Alexander
                                        Assistant United States Attorney
                                        Southern District No. 3770021
                                        Texas Bar No. 24125476
                                        1000 Louisiana, Suite 2300
                                        Houston, Texas 77002

Tel: (713) 567-9000
Fax: (713) 718-3300
Email: myra.siddiqui@usdoj.gov
E-mail: natasha.alexander@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2025, the foregoing was filed pursuant to the CM/ECF system. The unredacted version of this filing was provided directly to Plaintiffs' counsel via email. *See* Dkt. 93.

/s/ Natasha Alexander
Natasha Alexander
Assistant United States Attorney